**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SYLVIA HILL et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Case No. 14-cv-1893 (GMH) |
| | ) |
| DISTRICT OF COLUMBIA | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

In this action, Plaintiff Sylvia Hill and her son, Plaintiff "R.H." (together, referred to as "Plaintiffs"), seek reversal of the administrative hearing officer's determination, issued on August 12, 2014, denying all of their requested relief. They initiated this action under the Individuals with Disabilities Education Improvement Act ("IDEA"), alleging that the District of Columbia Public School System ("DCPS") denied R.H. a free appropriate public education ("FAPE"). Following the parties' consent to the undersigned's authority, this matter was referred to this Court for all purposes. Before the Court are the parties' cross-motions for summary judgment. Upon review of the record,[1] the Court will grant in part Plaintiffs' motion and deny DCPS' motion.

---

[1] The relevant docket entries for purposes of this Memorandum Opinion are: (1) Plaintiffs' Complaint ("Compl.") [Dkt. 1]; (2) Plaintiffs' Motion for Summary Judgment ("Pl. Mot.") [Dkt. 12]; (3) Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Mot.") [Dkt. 13]; (4) Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Opp.") [Dkt. 15]; (5) Defendant's Reply in Support of Defendant's Motion for Summary Judgment ("Def. Reply") [Dkt. 17]; (6) this Court's March 25, 2016 Report and Recommendation ("R&R") [Dkt. 18]; (7) Plaintiffs' Objection to the Report and Recommendation ("Pl. Obj.") [Dkt. 19]; (8) Defendant's Response to Plaintiffs' Objection ("Def. Resp.") [Dkt. 20]; (9) the Administrative Record ("AR") [Dkts. 9 & 10]; and (10) the Hearing Transcript from July 22, 2016 ("Hrg. Tr.").

1

## BACKGROUND

### A.     Plaintiff R.H.

R.H. is a nineteen-year-old student with a specific learning disability relating to academic performance and social-emotional functioning.  AR 59.[2]  During the 2011–2012, 2012–2013, and 2013–2014 school years, R.H. attended Eastern Senior High School ("Eastern"), a District of Columbia Public School.  Compl. ¶ 8.  This case concerns only the 2012–2013 and 2013–2014 school years, during which R.H. was enrolled in the ninth grade.  He and his family were homeless from 2011–2013, AR 149, until they obtained housing within Eastern's enrollment boundary, see id. at 112.  During the school years at issue, R.H. exhibited chronic absenteeism and academic underperformance.  See e.g., id. at 97 (failing Algebra I during the 2012–2013 school year because "[R.H.] did not complete the final exam . . . and he had 106 absences"), 118 (failing Public Policy during the 2013–2014 school year because "[R.H.] only comes 1 day a week and [the class] meets daily").  By the end of the 2013–2014 school year, R.H. had failed the ninth grade for the third consecutive year.  Compl. ¶ 9.

### B.     Plaintiffs' Due Process Complaint

On May 16, 2014, Plaintiffs filed an administrative due process complaint, alleging that DCPS violated R.H.'s right to a FAPE.  AR 192.  Plaintiffs raised ten separate issues in their complaint, including DCPS' alleged failure to:  (1) provide access to R.H.'s school records; (2) perform a comprehensive evaluation of R.H.; (3) perform comprehensive re-evaluations of R.H. upon Ms. Hill's request; (4) conduct a complete functional behavior assessment ("FBA")[3] of

_____

[2] Since the filing of the administrative due process complaint in the proceedings below, R.H. has reached the age of majority.  Compl. ¶ 4.

[3] An FBA is "a systematic process of identifying the purpose, and more specifically the function, of problem behaviors by investigating the preexisting environmental factors that have served the purpose of these behaviors." Patrick Ober, Proactive Protection:  How the IDEA can Better Address the Behavioral Problem of Children with

R.H.; (5) timely authorize an independent educational evaluation ("IEE"); (6) review existing evaluations to develop R.H.'s individualized education programs ("IEPs"); (7) develop appropriate IEPs based on R.H.'s educational needs; (8) properly implement R.H.'s IEPs; (9) provide an appropriate placement; and (10) include Ms. Hill in the IEP decision making process. Id. Plaintiffs' proposed remedies included a declaration that DCPS denied R.H. a FAPE; an order for DCPS to fund R.H.'s placement at New Beginnings Vocational School ("New Beginnings"); and an order to convene a new IEP meeting to review available evaluations, request funding for additional IEEs, and determine appropriate compensatory education for R.H. Id. at 202–03.[4]

## C.   The Administrative Record

On August 6, 2014, a due process hearing was held before a hearing officer. Id. at 443– 785. Several days later, the hearing officer issued her hearing officer's determination ("HOD"), denying all of Plaintiffs' requested relief. Id. at 3–13. This HOD was based on evidence in the academic record, including R.H.'s IEPs, multiple evaluations, Plaintiffs' representations, and testimony from special education experts. See id. The relevant portions of the administrative record are recounted below.

### 1.   January 2013 IEP

On December 11, 2012, a multidisciplinary team ("MDT") met to discuss R.H.'s academic status at Eastern. Id. at 23. During this meeting, Ms. Hill participated telephonically, and her legal representative and advocate, Jazmone Taylor, attended in person. Id. The rest of

---

Disabilities in Schools, 1 Belmont L. Rev. 311, 337 (2014) (citing Perry A. Zirkel, State Special Education Laws for Functional Behavioral Assessment and Behavior Intervention Plans, 36 J. Behav. Disorder 262, 262 (2011)).

[4] The IDEA prescribes a two-year statute of limitations. See 20 U.S.C. § 1415(f)(3)(C). Plaintiffs filed their due process complaint on May 16, 2014, AR 192, so they may only assert compensatory education claims beginning on May 16, 2012, see Damarcus S. v. Dist. of Columbia, No. 15-851 (ESH), 2016 WL 2993158, at *4 (D.D.C. May 23, 2016) (citing G.L. v. Ligonier Valley Sch. Dist. Auth., 802 F.3d 601, 616–26 (3d Cir. 2015)).

the MDT consisted of James Robinson, who represented the local educational agency ("LEA");
Travis Cox, R.H.'s case manager; and a social worker.  Id.  The team discussed R.H.'s
inconsistent attendance, his academic standing, his school uniform, and the availability of
transportation to and from school.  Id.  The team created an attendance plan, encouraging R.H. to
remain after school for extracurricular activities.  Id.  Further, it confirmed that R.H. "is
receiving transportation every month from Mr. [LaVaughn] Turner," and arranged for Mr. Cox
to "ask teachers to provide work packet[s] for [the] first 3 weeks of school."  Id.  Finally, the
team arranged for R.H. to wash his uniform at school.  Id.

Following the MDT meeting, Mr. Cox telephoned Ms. Hill to notify her about R.H.'s
upcoming IEP meeting on January 11, 2013, to which Ms. Hill responded that she would attend.
Id. at 25.  Mr. Cox also informed R.H. to attend school "so that [Mr. Cox] could test him for the
IEP."  Id.  On January 7, 2013, Mr. Cox sent R.H. home with a draft IEP so that Ms. Hill could
participate in the meeting by phone.  Id. at 30.  Plaintiffs ultimately did not attend or directly
participate in this meeting, though Ms. Taylor, their educational advocate, attended in person.
Id. at 37.  The IEP meeting was held on January 11, 2013, to update R.H.'s IEP goals in light of
the results from recent academic and vocational assessments.  Id. at 35.  Attendees included a
general education teacher; a social worker; Mr. Robinson, the LEA representative; and Mr. Cox,
who interpreted R.H.'s evaluation results and served as the team's special education teacher.  Id.
at 37.

This IEP diagnosed R.H. with a "specific learning disability," [5] prescribed annual goals
for three academic areas of concern – including mathematics, reading, and writing – and outlined

---

[5] Specific learning disability is

> a disorder in one or more of the basic psychological processes involved in understanding or in
> using language, spoken or written, that may manifest itself in the imperfect ability to listen, think,

a post-secondary transition plan for R.H.  Id. at 42–54.  Baselines for R.H.'s academic areas of concern were developed from the results of his Woodcock-Johnson III Test of Achievement ("WJ-III ACH") from December 18, 2012.  Id. at 42–45.[6]  First, R.H.'s math score placed him in the "low range," showing that "he lacks some foundational math skills."  Id. at 42.  Specifically, R.H. obtained (1) a "low" broad math standard score ("SS") of 70, which correlates to a grade equivalence ("GE") of 4.7; (2) a "very low" calculation SS of 63, which correlates to a GE of 3.8; (3) a "very low" math fluency SS of 67, which correlates to a GE of 3.9; and (4) an "average" applied problems SS of 90, which correlates to a GE of 6.6.  Id.  The IEP further noted R.H.'s poor Algebra I attendance, which prevented him from "develop[ing] higher order math skills," so R.H.'s mathematics goals in this IEP were "to correctly borrow in double-digit subtraction[,] . . . multiply a double-digit number by a single-digit number[,] . . . [and] add fractions" with at least 80% proficiency.  Id. at 42–43.

Second, R.H.'s reading score was in the "low range," showing a "basic ability to read and comprehend information" and a weakness for decoding unfamiliar words and sounds.  Id. at 43.  In particular, R.H. received (1) a "low" broad reading SS of 76, which correlates to a GE of 5.2; (2) a "low" letter-word identification SS of 74, which correlates to a GE of 4.8; (3) a reading fluency SS of 76, which correlates to a GE of 5.0; and (4) an "average" passage comprehension SS of 90, which correlates to a GE of 6.7.  Id.  According to the IEP, R.H.'s weakness in this

---

       speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.

34 C.F.R. § 300.8(c)(10).

[6] The WJ-III ACH is a standardized, nationally norm-referenced examination, divided into subtests, that assesses a student's level of educational proficiency against his age group and grade level.  Woodcock-Johnson® III Normative Update, Houghton Mifflin Harcourt, http://www.hmhco.com/hmh-assessments/cognitive-intelligence/wj-iii-nu (last visited July 7, 2016).

area "makes it difficult for [him] to read and process passages." Id. Thus, R.H.'s reading goals included correctly decoding unfamiliar words at his reading level, using context clues to determine the meaning of those words, and independently reading passages and using context to make accurate inferences, all with at least 80% proficiency. Id. at 43–44.

Finally, R.H. scored in the "very low range" for written expression, highlighting weaknesses with syntax, grammar, handwriting, and particularly with spelling. Id. at 45. According to the WJ-III ACH, R.H. received (1) a "very low" broad writing SS of 62, which correlates to a GE of 3.4; (2) a "low" writing fluency SS of 70, which correlates to a GE of 3.9; (3) a "low" writing samples SS of 76, which correlates to a GE of 4.6; and (4) a "very low" spelling SS of 63, which correlates to a GE of 2.9. Id. The IEP prescribed goals for R.H. to correctly use spelling rules during graded assignments and accurately capitalize and punctuate sentences with at least 80% proficiency. Id. at 45–46.

The IEP's post-secondary transition plan for R.H. was based on his reported interests as well as the results of his WJ-III ACH and BRIGANCE E–2 assessments – both administered on December 18, 2012. Id. at 50.[7] R.H. reported that he was interested in employment as a mechanic, a construction worker, and a photographer. Id. R.H.'s WJ-III ACH results, described above, indicated that he required additional development of necessary skills to manage a personal budget. Id. The BRIGANCE E–2 assessment revealed that R.H. prefers an outdoor, noisy working environment that requires physical energy, use of hands, and substantial training. Id. Using that information, the IEP prescribed goals for R.H.'s post-secondary education,

---

[7] The BRIGANCE Transition Skills Inventory ("TSI") contains age-appropriate vocational assessments that support transition planning for high school students. See Supporting Transition Plans for Students with Severe Cognitive Delays, BRIGANCE®, 2, http://casamples.com/downloads/TransitionPlanSupport-TSI-IEDIII.pdf (last visited July 8, 2016). Section E–2 of the TSI is an oral assessment that evaluates the career interests of students with severe cognitive delays. Id.

employment, and independent living.  Id. at 51–53.  In anticipation of receiving post-secondary

technical training, R.H.'s goal was to research technical training programs, for which school

officials would provide guidance for one hour during the year.  Id. at 51.  To achieve full-time

employment, R.H.'s goal was to conduct information interviews with mechanics regarding their

education and skill requirements, and the school agreed to assist R.H. with interview practice for

one hour per month.  Id. at 52.  As for properly maintaining a budget upon graduating, R.H.'s

goal was to work with teachers for one hour per year to ascertain the categories of daily living

expenses and the average amounts of each.  Id. at 52–53.

Additionally, the IEP prescribed standardized testing accommodations, specialized

instruction, and transportation services for R.H.  Id. at 47–49.  The testing accommodations

allowed R.H. to receive repetition of classroom and testing directions, to write in his test

booklets and use a calculator for assistance, and to take tests in a separate setting for an extended

duration.  Id. at 48.  Moreover, the IEP prescribed ten hours of weekly specialized instruction for

R.H. that should occur "outside of the general education setting."  Id. at 47.  Prior to this IEP,

R.H. received this instruction within general education classrooms for only five hours per week,

but his failing grades necessitated the change.  Id.  The IEP also required that R.H. receive access

to the Washington Metro System ("Metro") for transportation to and from school, and it

expressly denied R.H. access to extended school year services.  Id. at 49.

2.        School-Administered Psychological Evaluation

During the MDT meeting held on December 11, 2012, Ms. Hill requested that DCPS

perform "a comprehensive psychological" evaluation on R.H. because "there were no

evaluations on [R.H.'s complete educational] file."  Id. at 24.  DCPS obtained Ms. Hill's written

consent for this evaluation on January 18, 2013, id. at 56, and the evaluation was conducted on February 14, 2013, id. at 58.

The results of this evaluation were released in a report on March 4, 2013, which contained results from a Reynolds Intellectual Assessment Scale ("RIAS") and information gathered from interviews with Plaintiffs and R.H.'s teachers.  Id.[8]  R.H.'s RIAS results included a CIX of 72, a VIX of 84, and a NIX of 81 – all of which fall within the "Low Average" range – and a CMX of 77, which falls within the "Borderline" range.  Id. at 65–66.  These scores indicated that R.H. more effectively processes verbal information if accompanied by visual representations, that he requires multi-step directions to be broken down and repeated, and that learning accommodations would assist R.H. with initiating and completing assignments.  Id. at 66.  This evaluation also obtained interviews from R.H.'s English and World History teachers. Id. at 63.  R.H.'s English teacher reported that he "[d]oes not come to class often or turn in homework," but when R.H. does attend class, he quickly understands the content and acts respectfully towards the teacher.  Id.  The World History teacher reported that R.H. is focused when attending class, but he never completes homework.  Id.  Both teachers have previously encouraged R.H. to attend after-school tutorials and have sent R.H. home with make-up work packets, but he never attends after-school tutorials and the packets never return to school.  Id.

During R.H.'s evaluative interview, he reported that he fails to regularly attend school either because of illnesses or, more often, because "he just did not feel like coming."  Id.  He also reported attempting homework assignments but struggling to complete them without extra help. Id.  R.H. expressed interest in obtaining one-on-one tutoring but was resistant to staying after

---

[8] The RIAS assesses cognitive intelligence by assessing both verbal and nonverbal reasoning and memory abilities. AR 64.  A student's scores form three indices:  the Verbal Intelligence Index ("VIX") for verbal reasoning, the Nonverbal Intelligence Index ("NIX") for nonverbal reasoning – both of which form the Composite Intelligence Index ("CIX") – and the Composite Memory Index ("CMX") for both verbal and nonverbal memory.  Id.

school for tutoring.  Id.  The evaluator could not reach Ms. Hill for an interview, but she noted

her prior concerns regarding R.H.'s ability to "get to school" and the provision of homework

assignments to improve his academic performance.  Id.  The evaluator also attempted several

times to observe R.H. in class, but each attempt was unsuccessful "due to [R.H.'s] inconsistent

attendance."  Id.  According to the report's summary, the interviews and R.H.'s scores indicated

that his "difficulty with memory, social emotional functioning, and academic problems [were]

consistent with learning difficulties associated with [a] Specific Learning Disability."  Id. at 69.

       The report recommended that R.H. consult with a social worker or counselor for social-

emotional support relating to his "motivation, anxiety, and frustration in the classroom," and that

an attendance plan or behavioral plan would "assist [R.H.] in getting to school and going to class

consistently."  Id. at 70.  It also recommended teaching strategies to accommodate R.H.'s

specific learning disability, such as providing interactive learning activities, allowing R.H. to

take small breaks from larger assignments, and applying a multimodal learning approach.  Id.

On March 20, 2013, DCPS left a voicemail with Ms. Hill to schedule a meeting to review the

report.  Id. at 32.  The administrative record does not contain a response from Ms. Hill or any

other communication from DCPS regarding such a meeting.

       3.     Ms. Hill's August 1, 2013 Request for Additional Evaluations

       On August 1, 2013, Plaintiffs submitted a written request for DCPS to perform four

independent educational evaluations ("IEEs") of R.H.:[9] a comprehensive psychological

evaluation, an FBA, a speech-language evaluation, and a vocational level II assessment.  Id. at

110, 276.  On September 13, 2013, Plaintiffs' new legal representative, Nicholas Ostrem,

---

[9] Under 34 C.F.R. § 300.502(b), "[a] parent has the right to an [IEE] at public expense if the parent disagrees with an evaluation obtained by the public agency[.]"  34 C.F.R. § 300.502(b).

emailed DCPS to assess the status of the pending IEE request. Id. at 106. That same day, Mr. Robinson, the LEA representative, responded that he had not received Plaintiffs' request, but "once [Ms. Hill] signs the consent[,] DCPS will complete" the requested FBA and speech-language assessment. Id. at 105. On September 17, 2013, Ms. Hill clarified that she also requested IEEs for the comprehensive psychological evaluation and the vocational assessment. Id. at 303. She challenged the comprehensive psychological evaluation from March 4, 2013, and the vocational assessment from December 18, 2012, both of which DCPS had previously conducted. Id.[10] During an MDT meeting on October 10, 2013, Ms. Hill, with Mr. Ostrem present, signed a consent form for DCPS to administer the FBA. Id. at 128. However, DCPS refused to administer a speech-language assessment of R.H. before its speech pathologist could perform a classroom observation "to determine any possible negative effects [R.H.'s] verbal expression abilities [were] having on his academic growth[.]" Id. at 124. The MDT also took note of Ms. Hill's representation that R.H. had received speech-language services for a 10-year-old speech impediment and that it "no longer affect[ed] his communication." Id. Indeed, a speech-language evaluation was conducted on March 9, 2004, which recommended no services "in the area of speech language." Id. at 60–61.

### a.     School-Administered Functional Behavior Assessment

After the MDT meeting, DCPS called and emailed Mr. Ostrem on November 25, 2013, to schedule an IEP Team meeting to discuss the forthcoming FBA's results. Id. at 32, 300. The results were released in a report dated December 1, 2013. Id. at 142–45. The meeting was scheduled for December 19, 2013. Id. at 101. According to the FBA report, the examiner

---

[10] By contrast, following Ms. Hill's August 1, 2013 request, DCPS was not required to arrange for independent evaluations regarding the requested FBA and speech-language evaluation because no previous evaluations were available. See 34 C.F.R. § 300.502(b)(1).

gleaned information from classroom observations, teacher questionnaires, an interview with

R.H., reviews of R.H.'s attendance records and progress reports, and data from antecedent-

behavior-consequence ("ABC")[11] charts and Ohio Scales.[12]  Id. at 143–44.[13]

The report identified R.H.'s truancy as his primary concern because of its harm to his

academic achievement, but the report noted that "[b]ehaviorally[,] [R.H.] seems to be doing

well." Id. at 142.  The report emphasized the results of R.H.'s Ohio Scales assessment,

particularly the problem severity section, which "measures occurrences and the significance of

problematic behaviors (i.e.[,] arguing, opposition, lying, sadness, etc.)." Id.  Examinees quantify

the student's behavior on a scale of 0 to 100, with higher scores indicating more significant

behavioral issues. Id.  Teachers gave R.H. an average score of 2.5 out of 100 for this section:

"the lowest average score, given by teachers, that [the examiner] ha[d] ever seen." Id.

Meanwhile, R.H. self-scored his problem severity as 31 out of 100, specifically identifying

anger, anxiety, and depression as his problems. Id.  The report noted that R.H.'s self-reported

score was "clinically significant," and that his truancy was likely related to anxiety and

depression, but it further noted that R.H.'s problems "most often occur[] before he arrives to

school." Id.

Next, the report assessed the characteristics of R.H.'s truancy, opining that it results from

his lack of motivation, depressive symptoms, and poor self-esteem. Id.  In addition, the report

---

[11] The ABC correlation is a tool employed to determine the cause and effect of a student's behavioral issues.  See AR 577.

[12] The Ohio Youth Problems, Functioning, and Satisfaction Scales ("Ohio Scales") measure outcomes for youths who receive mental health services.  Measurement Tools, California Evidence-Based Clearinghouse for Child Welfare, http://www.cebc4cw.org/assessment-tool/ohio-youth-problems-functioning-and-satisfaction-scales-ohio-scales/ (last accessed August 22, 2016).

[13] While the FBA states that ABC charts, interviews, questionnaires, and classroom observations were used to compile this report, these information-gathering tools are not documented in the administrative record.

identified that R.H.'s homelessness and Ms. Hill's physical ailments as major environmental contributors to his truancy.  Id. at 143.[14]  At school, R.H. has previously received detention as a consequence for his truancy, but "[he] is rarely consequenced for behavioral incidents due to his routine pattern of good behavior."  Id.  Ms. Hill also represented that R.H. receives psychiatric therapy at Community Connections, where he was diagnosed with depression and prescribed treatment.  Id.  According to the report, therapy appeared to improve R.H.'s decision-making skills and academic performance, considering his 0.8 GPA increase while participating in therapy.  Id.

When analyzing R.H.'s academic problems, the report failed to uncover "any significant problematic behaviors related to resistance, defiance, or opposition."  Id. at 144.  Instead, the report concluded that his problems "ha[ve] been completely related to his truancy," which partly results from depression and lack of motivation.  Id.  None of these issues appeared to relate to environmental factors within the school environment; rather, the assessment only revealed off-campus contributors – i.e., homelessness, poverty, and Ms. Hill's physical ailments – in addition to R.H.'s depression and lack of motivation.  Id.  Ultimately, the report recommended that Plaintiffs schedule a medication evaluation to determine if R.H. could benefit from a Zoloft prescription for his depression, that Ms. Hill encourage R.H. not to skip school to care for her, and that R.H. seek part-time employment to help his family without sacrificing his education.  Id. at 144–45.

### b.    Independently Administered Psychological Evaluation

Plaintiffs arranged for an independent comprehensive psychological evaluation at the District's expense, which occurred on November 6, 2013.  Id. at 147.  This IEE garnered

---

[14] It appears from the record that Ms. Hill suffers from a physical disability, the care for which contributed to R.H.'s absenteeism.  The nature and severity of this disability remains unknown to the Court.

information from interviews with Plaintiffs and teachers, classroom observations, projective tests, and results from four assessments:  (1) the Wechsler Adult Intelligence Scale ("WAIS–IV"), which measures cognitive functioning; (2) the Wechsler Individual Achievement Test ("WIAT–III"), which measures learning aptitude; (3) the Beery-Buktenica Developmental Test ("Beery VMI"), which measures the integration of visual and motor abilities; and (4) the Behavior Assessment Scale for Children ("BASC–2"), which measures social and emotional functioning through survey responses.  Id. at 147–60.  Plaintiffs received the results of this evaluation in a report dated December 18, 2013.  Id. at 147.  Mr. Ostrem forwarded the report to DCPS on that same day.  Id. at 101.

According to the report, the examiner first interviewed R.H. and Mr. Cox – R.H.'s previous case manager and current reading teacher – about his in-class behavior and performance.  Id. at 150.  Mr. Cox reported that R.H. is focused in his five-person reading class, he works well with classmates and the teacher, he maintains "very high verbal cognition, but is on a seventh grade reading level," and his attendance improved from the previous year.  Id.  R.H. reported significant stress due to his family's homelessness, causing him to feel anger and depression.  Id.  In his interview, R.H. stated that he hopes to graduate from high school and find work as a landscaper or mechanic.  Id.  During classroom observations, R.H. followed all directions and was "on-task and focused" for most of class, but he neither completed every in-class assignment nor arrived to class with all necessary materials.  Id. at 151.

Two projective tests – the Graphic Projective Technique and Three Wishes Technique – were also performed in this evaluation.  Id. at 159–60.  The Graphic Projective Technique asked R.H. to draw pictures of a house, a tree, and a person to "provide a measure of self-perceptions and attitudes."  Id. at 159.  According to the drawings, R.H. may suffer from depression, anxiety,

and low self-esteem, and he may be defiant and aggressive when overwhelmed.  Id.  The Three

Wishes Technique identifies the events that might alleviate anxiety by asking R.H. to name three

wishes he would want to come true.  Id.  R.H. wished for (1) more money, (2) all of his problems

to go away, and (3) his mother to walk again.  Id. at 159–60.  The examiner noted that the

content of R.H.'s wishes result from his inability "to cope with the various internal and external

stressors" in his life, and the examiner opined that R.H.'s coping mechanism may manifest as

hyperactivity, impulsivity, and inattention.  Id. at 161.

Finally, the report included the results of multiple assessments that evaluated R.H.'s

academic and social intelligence.  The WAIS–IV placed R.H.'s cognitive abilities at the 13th

percentile, which falls in the "extremely low" range.  Id. at 152.  According to the WIAT–III,

R.H. received (1) a "below average" oral language SS of 83, which correlated to an average GE

of 6.5 and placed his oral language abilities better than or equal to 13% of students his age; (2) a

"low" basic reading SS of 62, which correlated to an average GE of 2.6 and placed his basic

reading abilities better than or equal to 1% of students his age; (3) a "low" written expression SS

of 57, which correlated to an average GE of 2.8 and placed his writing abilities better than or

equal to 0.2% of students his age; and (4) an "average" mathematics SS of 73, which correlated

to an average GE of 4.8 and placed his mathematics abilities better than or equal to 4% of

students his age.  Id. at 153–55.  In addition, the Beery VMI placed R.H.'s integration of visual

and motor abilities in the "below average" range.  Id. at 156.  R.H.'s BASC–2 survey reported

that he is in the "clinically significant" range for depression and anxiety, Mr. Cox's survey

reported that R.H. is in the "at risk" range for somatization,[15] and R.H.'s survey indicated

_____

[15] Somatization is "the conversion of mental experiences or states into bodily symptoms."  Dorland's Illustrated
Medical Dictionary 1544 (28th ed. 1994).

"clinically significant" anxiety and somatization, as well as an "at risk" level of depression and sense of inadequacy.  Id. at 160.

The examiner made several recommendations in the report, some of which she later clarified in an affidavit for the due process hearing.  See id. at 161–62.  In her original report, the examiner recommended that R.H.'s IEP classify R.H. as a student with a special learning disability, but she also recommended including in R.H.'s IEP an "emotional disturbance" classification.  Id. at 161.[16]  Additionally, she recommended that R.H. receive intensive, full-time specialized instruction in a small class setting.  Id.  The examiner also believed that R.H. should be placed in a full-time vocational school "which offers training in the auto mechanics trade." Id. at 161–62.  In her affidavit, the examiner reasoned that R.H.'s low academic scores and social difficulties would benefit from a trade school that also remediates academic deficits.  Id. at 401. The examiner next recommended that R.H. receive out-of-school tutoring and in-school counseling to address his academic and social difficulties.  Id. at 162.  Finally, she recommended that R.H. receive a vocational level II assessment "to assist with his vocational goals, and the transition to independent living," as well as a speech-language evaluation to "ascertain if [R.H.] will require speech and language services in the school setting."  Id.  In her affidavit, the examiner opined that no evidence suggests that R.H. "has ever received [v]ocational testing,"

---

[16] Emotional disturbance is

> a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:  (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.  (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.  (C) Inappropriate types of behavior or feelings under normal circumstances.  (D) A general pervasive mood of unhappiness or depression.  (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.8(c)(4)(i).

and that a vocational level II assessment would reveal R.H.'s career aptitude and the necessity for career exploration.  Id. at 402.

### 4.  December 2013 IEP

During the MDT on October 10, 2013, DCPS coordinated with Plaintiffs to create an attendance plan to address R.H.'s absenteeism.  Id. at 124–25.  Ms. Hill attended this meeting with Mr. Ostrem, R.H.'s sister, and special education advocate Sharon Millis.  Id. at 123.  R.H. did not physically attend, but he telephonically joined a portion of the meeting.  Id. at 125. DCPS also arranged for several of its representatives to attend this meeting:  Mr. Robinson, in his capacity as the LEA representative; Eliza Robinson, as R.H.'s special education teacher and case manager; as well as a social worker and speech pathologist.  Id. at 123.  At the meeting, R.H. reported that he most commonly stayed home because he either felt ill, needed to care for his sick mother, lacked a clean uniform, or could not use his Metro pass after 9:00 a.m.  Id. at 124.  R.H. reported that he had received a new Metro pass on October 9, 2013, and DCPS agreed that R.H. could receive new monthly passes from school officials in the future.  Id. at 124, 131. DCPS also agreed to allow R.H. to utilize Eastern's laundry facilities to wash his clothes and recommended that R.H. obtain new clothes from community charities as Eastern had no more uniforms to provide.  Id. at 131.

R.H.'s current IEP was set to expire on January 10, 2014, see id. at 40, so his IEP Team agreed to convene an IEP meeting at 12:00 p.m. on December 19, 2013, id. at 101.  Prior to this meeting, DCPS collected progress reports from R.H.'s teachers, id. at 136–40, and DCPS administered the FBA described above, id. at 101.  DCPS forwarded the FBA to Plaintiffs on December 5, 2013.  Id. at 310.  Plaintiffs also obtained the independent psychological evaluation, which was described above, on December 18, 2013.  Id.

Plaintiffs forwarded the independent psychological evaluation results to DCPS at 2:07 p.m. on December 18, 2013.  In response, DCPS stated in an email that "another meeting will need to be scheduled to review the evaluation given it was provided on such short notice."  Id. at 299.  Plaintiffs, through their attorney, replied that same day, requesting that the IEP meeting be rescheduled.  See id. at 298.  On the morning of the IEP meeting, Plaintiffs' attorney repeated that request in a voicemail he left with the LEA representative.  See id.  One hour before the scheduled IEP meeting, he again emailed DCPS to reschedule the meeting because Ms. Hill was also feeling ill.  Id.[17]  DCPS finally responded nearly six hours after the IEP meeting's start time, stating that the meeting was held on schedule because all necessary members had committed to attend.  Id.  The participants included Mr. Robinson in his capacity as the LEA representative; one of R.H.'s general education teachers; a social worker; and Ms. Robinson, who attended the meeting to interpret R.H.'s evaluation results and to serve as the team's special education teacher.  Id. at 167.  DCPS promised to provide Plaintiffs no earlier than January 19, 2014 with both a copy of the IEP and proposed dates for an additional meeting to amend the IEP in accordance with the independent evaluation's results.  Id. at 298.  According to DCPS, it would not be able to convene another IEP meeting to review the independent evaluation for thirty calendar days.  Id.

On December 20, 2013, Plaintiffs' attorney admonished DCPS for conducting the IEP meeting in Ms. Hill's absence and for failing to include a psychologist to review the independent evaluation at the meeting.  Id. at 310.  His email asked to reconvene the IEP Team during the first week of January 2014 to amend the IEP, and stated that "[i]f not, we're just going to file" a

---

[17] While the record includes this email, it only references the first two of the attorney's requests to reschedule. Nevertheless, DCPS did not correct the record in subsequent email exchanges, its motion briefs, or during the proceedings before this Court, so the Court will treat these factual representations as undisputed.

lawsuit.  Id.  In response, DCPS explained that the special education office would be closed

during the holiday break[18] and confirmed its intent to provide dates for an additional IEP

meeting to review the independent evaluation.  Id. at 336.  However, DCPS later admitted that it

never provided dates pursuant to this promise, and a subsequent IEP meeting was never held.

Hrg. Tr. at 3.  Plaintiffs' attorney replied on December 23, 2013 that he viewed DCPS' response

"as a refusal to convene an IEP team meeting with [Ms. Hill's] input by" the current IEP's

January 10, 2014 expiration date.  AR 336.

As for the December 2013 IEP itself, it updated R.H.'s annual goals for his academic

areas of concern and included a post-secondary transition plan.  Id. at 169–81.  DCPS first

updated R.H.'s mathematics and reading goals from the results of Form B of the WJ-III ACH,

which R.H. took on December 18, 2013.  Id. at 169.  According to those results, R.H.'s math

score remained in the "low range," showing that he still "lacks some foundational math skills."

Id.  Specifically, he obtained (1) a "low" broad math score that correlated to a GE of 4.7; (2) a

"very low" calculation score that correlated to a GE of 4.1; (3) a "low" math fluency score that

correlated to a GE of 5.2; and (4) an "average" applied problems score that correlated to a GE of

6.6.  Id.  R.H.'s new mathematics goals were to solve equations and inequalities "with 75%

accuracy[,] as measured by quarterly Paced Interim Assessments and observations," and to use

properties of real numbers to simplify calculations.  Id. at 169–70.

Regarding R.H.'s reading score, it also remained in the "low range," showing the same

"basic ability to read and comprehend information" and the same weakness for decoding

unfamiliar words and sounds as in the January 2013 IEP.  Id. at 170.  In particular, R.H. received

---

[18] During the 2013–2014 school year, DCPS held its winter break from Friday, December 21, 2013, through Sunday, January 5, 2014.  DCPS Calendar:  School Year 2013–14, 6–7, available at http://dcps.dc.gov/node/936772 (last accessed August 22, 2016). Monday, January 6 was designated as a professional development day for teachers and staff members only.  Id.

(1) a "low" broad reading score that correlated to a GE of 5.2; (2) a "low" letter-word identification score that correlated to a GE of 3.9; and (3) a reading fluency score that correlated to a GE of 6.5. Id.[19] R.H.'s new reading goals were to explicitly cite, and draw inferences from, textual evidence to support his analysis of "what the text says," and to analyze how complex characters develop relationships throughout the text and advance the plot. Id.

DCPS determined R.H.'s new writing score from the results of a WIAT–III from November 6, 2013. Id. at 171. Specifically, these results revealed a "low" written expression SS of 57, which placed R.H.'s writing abilities greater than or equal to 0.2% of other students his age, and a "very low" sentence composition SS of 54, which correlated to a GE of 1.5. Id. The IEP highlighted weaknesses with syntax, grammar, handwriting, and particularly with spelling. Id. R.H.'s goals for this area of concern were to develop "experiences or events using effective techniques, well-chosen details, and well-structured event sequences," and to develop or strengthen writing by planning, revising, editing, rewriting, or trying something different. Id.

The IEP's post-secondary transition plan collected information from R.H.'s reported interests and the results of his WJ-III ACH and BRIGANCE E–2 assessments, collected on December 18, 2013. Id. at 146, 177. According to R.H., his functional interests included "looking for jobs, driving, [and] making a resume." Id. at 146. He also expressed interests in attending community college or vocational school, as well as interests in learning "[h]ow to work on cars, how to build stuff, [and] how to work hard." Id. Regarding R.H.'s assessment results, his scores for both the WJ-III ACH and BRIGANCE E–2 were identical to his respective scores from the January 2013 IEP. See id. at 177. As for R.H.'s vocational goals, his new post-

---

[19] Unlike the January 2013 IEP, it appears that no SSs were provided for the WJ-III ACH taken prior to the December 2013 IEP. Further, the December 2013 IEP contained neither a range for R.H.'s reading fluency SS nor any information regarding his passage composition.

secondary education goal was to research community college programs, for which school officials would provide guidance for one hour during the year.  Id. at 178.  R.H.'s new employment goal was to research requirements to become a landscaper and review those requirements with his teacher.  Id. at 179.  His new independent living goal was to acquire a driver's license by studying a driver's education handbook and correctly answering at least 80% of the questions on a practice test.  Id. at 180.  To assist R.H. with the completion of these goals, DCPS would provide him with access to a computer for four hours per year to research landscaper requirements and driver's education websites.  See id. at 179–80.

Additionally, this IEP retained much of R.H.'s prior testing accommodations and related instructional services.  Id. at 173–76.  Like the January 2013 IEP, R.H.'s testing accommodations allowed him to receive repetition of classroom and testing directions, to write in his test booklets and use a calculator for assistance, and to take tests in a separate setting for an extended duration. Id. at 175.  This IEP also continued prescribing ten hours of weekly specialized instruction for R.H. "outside of the general education setting," id. at 174, and it still denied R.H. access to extended school year services, id. at 176.  However, the December 2013 IEP deviated from the prior IEP in that it no longer required DCPS to provide R.H. with access to transportation services, id., and that it included as a "special factor" that R.H.'s behavior did not impede his or others' learning.  Id. at 168.  On May 16, 2014, Ms. Hill filed an administrative due process complaint on behalf of R.H.  Id. at 192.

5.    <u>Due Process Hearing</u>

A due process hearing occurred on August 6 and 8, 2014, id. at 407, during which Plaintiffs both testified and were represented by counsel, id. at 503–54.  Plaintiffs also arranged for two special education experts – Ms. Millis and Sharold Smith – to testify on their behalf.  Id.

20

at 557–636, 638–48.  Additionally, DCPS proffered testimony from Mr. Cox, R.H.'s special education teacher and case manager at Eastern.  Id. at 655–736.  The relevant portions of each witness' testimony are summarized below.

### a.    Ms. Hill's Testimony

During Ms. Hill's testimony, she reported that R.H. was prohibited from attending Eastern for the first six weeks of the 2012–2013 school year because DCPS claimed that he resided outside of Eastern's district boundary.  Id. at 511.  She also testified that R.H. did not receive home-instruction from any DCPS teachers during that period.  Id. at 512.  According to Ms. Hill, R.H. was permitted to return to Eastern only after she spoke to the school board.  Id. at 511.  Once R.H. returned, DCPS informed Ms. Hill that R.H. would receive a "tag along [to] help[] and assist him with his work."  Id.  According to Ms. Hill, no such accommodation ever occurred.  Id. at 515–16.

Referring to the MDT meeting from October 10, 2013, Ms. Hill testified that she had requested counseling services to address R.H.'s mental health problems and that DCPS had refused her request.  Id. at 518.  She also asked DCPS why it had discontinued R.H.'s speech-language services without a speech evaluation, but DCPS responded that it found no need to continue those services.  Id. at 519.  Ms. Hill further testified that R.H.'s attendance plan, which was developed during that meeting, "worked out for like the first week[,] and then when [Plaintiffs] moved[,] . . . everything changed."  Id. at 520.  According to Ms. Hill, DCPS informed R.H. in January 2014 that it would no longer provide him with transportation because he moved closer to Eastern.  Id. at 522.  As a result, Ms. Hill paid $30 per month for R.H. to access the Metro for the remainder of the 2013–2014 school year.  Id.

Regarding Ms. Hill's participation in R.H.'s IEP meetings, she testified that "[she] wanted to take part and advocate for [R.H.]" Id. at 524.  She wanted to discuss R.H.'s transportation problem and mental health difficulties for his January 2013 IEP but, for reasons unknown to the Court, she was unable to attend the meeting.  Id. at 514.  For R.H.'s December 2013 IEP, Ms. Hill testified that DCPS refused her request to reschedule the meeting for January 10, 2014.  Id. at 523–24.  Ultimately, Ms. Hill testified that she did not believe that Eastern was meeting R.H.'s individual needs.  Id. at 526.  She explained that Eastern did not "prepare [R.H.] for the work market" because it lacked any vocational programs.  Id. at 525.  Eastern instead has an after-school vocational program, but Ms. Hill testified that "you got to get good grades" to attend.  Id.  Ms. Hill also testified that R.H. would benefit from both independent tutoring and counseling services, and that R.H. would take advantage of such opportunities if they became available to him.  Id. at 527–28.

### b.      R.H.'s Testimony

When asked about the 2012–2013 school year, R.H. testified that he could not attend Eastern for "some weeks" in the beginning because DCPS informed R.H. that he "wasn't in the boundary." Id. at 535.  R.H. also submitted that DCPS did not provide him with tutoring or home-instruction during that period.  Id.  As for the remainder of that school year, R.H. testified that he used the Metro to arrive at school, as well as a "free bus[,] . . . but [he was] not always up to make the free bus." Id. at 536.  R.H. explained that Ms. Hill, "and sometimes the school," provided him with access to the Metro throughout that year, but his attendance suffered because that access was "not always" provided.  Id.  R.H. further testified that he was only enrolled in general education classes that school year and received no specialized instruction from an inclusion teacher within those classes.  Id. at 537.

When asked about his classes during the 2013–2014 school year, R.H. testified that he was enrolled in at least one special education course.  Id. at 540.  Moreover, R.H. testified that an inclusion teacher assisted him with Algebra I for two or three class periods each week, but this teacher assisted the entire class.  Id. at 540, 548.  R.H.'s major issues during that school year involved his school uniform and school transportation.  Id. at 538.  Regarding R.H.'s uniform, he explained that "[s]ometimes [it] wasn't clean, [and] sometimes [he] didn't have the right color to wear."  Id.  R.H. also explained that he could not afford to pay for public transportation, so DCPS sometimes gave him bus tokens at the beginning of the school year.  Id. at 538–39.  However, according to R.H., DCPS discontinued his transportation service "a little bit before Christmas break," so Ms. Hill provided him with transportation for the remainder of the school year.  Id. at 539.

During R.H.'s testimony, he also discussed his vocational needs.  First, he testified that Eastern did not provide any vocational programs during either school year other than an after-school program.  Id. at 541.  He also testified that DCPS never helped him research community college or vocational programs, interview mechanics or landscapers regarding their work requirements, or make progress in acquiring a driver's license.  Id. at 541–42.  In addition, R.H. stated that DCPS never helped him develop independent-living skills, such as cooking, cleaning, and laundry.  Id. at 542.  R.H. clarified during cross-examination that DCPS did provide him with a laundry service during the 2013–2014 school year, which he used to clean his uniform. Id. at 549–50.  When asked about his overall educational needs, R.H. testified that Eastern did not teach him "anything academically" or help him "to get a job and start driving."  Id. at 542–43. By contrast, R.H. believed that New Beginnings would be an appropriate placement for him because it has "the skills you need to survive."  Id. at 544.

### c.      Sharold Smith's Testimony

On August 6, 2014, Sharold Smith, the Director of New Beginnings, testified as a witness for Plaintiffs.  Id. at 638–48.  She explained that New Beginnings is a private, full-time vocational school that offers an eleven-month instructional program, contains small class sizes, and adheres to the same academic requirements as DCPS.  Id. at 641.  She also explained that New Beginnings offers speech and counseling services, id. at 643, and it primarily serves students with disabilities, 80% of whom have DCPS as their LEA, id. at 642.  After testifying that New Beginnings had accepted R.H. into its program, Ms. Smith informed the hearing officer that R.H.'s IEP Team would have to arrange for his transportation to New Beginnings.  Id. at 646.  She concluded that New Beginnings "definitely ha[s] the small, well-structured environment to help [R.H.] with [his] academics . . . [and] vocational needs."  Id. at 647.

### d.      Sharon Millis' Testimony

Plaintiffs also arranged for Ms. Millis – a special education advocate – to testify as a special education expert during the due process hearing.  Id. at 557–637.  According to Ms. Millis' curriculum vitae, she possesses "over 40 years of experience and dedication to the special needs student[,] . . . with consummate expertise in both the classroom and administrative areas." Id. at 432.  Her credentials as a special education expert were accepted by the hearing officer over DCPS' objection.  Id. at 562–63.  Ms. Millis testified that she met with R.H. on one occasion, id. at 622, that she attended the MDT meeting which was held on October 10, 2013, id. at 563, and that she had reviewed R.H.'s available evaluations and IEPs, id. at 576, 585.  Ms. Millis recounted that during the MDT meeting, Ms. Hill asked DCPS to arrange for R.H. to take a speech-language evaluation, an FBA, and a vocational level II assessment, but DCPS only consented to the FBA.  Id. at 568–69.  Ms. Millis also recalled that Ms. Hill requested counseling

services during this meeting, which both Ms. Millis and Ms. Hill felt were "critical for [R.H.] . . . [b]ecause of the depressive disorder and . . . anxiety." <u>Id.</u> at 569.  However, Ms. Millis continued, DCPS disagreed that "there was a need for counseling" and refused to provide those services to R.H.  <u>Id.</u>  Additionally, the MDT discussed R.H.'s transportation issues, and Ms. Millis testified that DCPS agreed "to give [R.H.] tokens to get back and forth" from Eastern during that meeting.  <u>Id.</u> at 570.

Ms. Millis also testified regarding Plaintiffs' requested IEE, specifically the independent psychological evaluation that was issued on December 18, 2013.  <u>Id.</u> at 583.  She first asserted that DCPS authorized the independent psychological evaluation eighty-one days after Ms. Hill's August 1, 2013 request, "[b]ecause that's when the IEE letter was given."  <u>Id.</u> at 582–83.[20]  Ms. Millis next explained that she had issued thousands of IEE requests throughout her career as an educator, and when asked how long the authorization period typically lasted, Ms. Millis replied that she had "never had an IEE go over three weeks."  <u>Id.</u> at 583.  Regarding the independent psychological evaluation itself, Ms. Millis opined that DCPS had never reviewed it because "[t]he [IEP] meeting was held on [December] 19th[,] . . . even though [DCPS] had the evaluation."  <u>Id.</u> at 584.  During cross-examination, Ms. Millis admitted that she reasonably expects to receive evaluations two or three days before an IEP meeting, "[a]nd that's what DCPS gives," <u>id.</u> at 621, but Ms. Millis later clarified that DCPS has expected her to review evaluations on the day of an IEP meeting "many times," <u>id.</u> at 634.

When asked about R.H.'s evaluations, Ms. Millis asserted that DCPS failed to provide a comprehensive psychological re-evaluation before R.H.'s December 2013 IEP.  <u>Id.</u> at 581.  Ms.

_____

[20] Based on Ms. Millis' testimony, this letter should have been dated October 21, 2013, but no such letter can be found in the administrative record.  However, the parties do not dispute that eighty-one days elapsed between Ms. Hill's request for the IEE and DCPS' authorization of it.

Millis first testified that the psychological evaluation which DCPS issued on March 4, 2013, was unsatisfactory because it only included an intellectual assessment. Id. at 571–72. Ms. Millis remarked that this evaluation included neither clinical assessments nor educational assessments, id., but she did not know whether a satisfactory evaluation required the inclusion of those assessments, id. at 617. Regarding the FBA that DCPS issued on December 1, 2013, Ms. Millis claimed that it lacked classroom observations and an ABC correlation. Id. at 576–77. She also claimed that the FBA and psychological evaluation should have been administered together "so that [DCPS could have] gather[ed] the information and utilize[d] the information together." Id. at 578–79.

As for Ms. Hill's requested speech-language evaluation, Ms. Millis testified that it was necessary because "[R.H.] had speech language when he was younger . . . [and] [n]o one knows why speech language was dropped." Id. at 572. Ms. Millis also testified that R.H.'s age justified the vocational level II assessment, which she explained should be administered at sixteen years of age to assist with "career management, career exploration[,] and career training." Id. at 574.[21] Ms. Millis concluded this part of her testimony by claiming that a comprehensive re-evaluation required a speech-language evaluation and vocational evaluation – since they would have assessed R.H.'s communication and vocational needs – as well as "a comprehensive psychological [evaluation] and a comprehensive FBA[.]" Id. at 581, 598.

Prior to the hearing, Ms. Millis had reviewed both of R.H.'s available IEPs, and she testified to the inadequacy of both documents. Id. at 585 (January 2013 IEP), 597 (December 2013 IEP). When asked whether the January 2013 IEP possessed appropriate goals and

---

[21] Ms. Millis explained that vocational level I assessments consist of "a very basic questionnaire," while vocational level II assessments provide "a little bit more on career exploration and career planning and career management," and vocational level III assessments "take[] several days in order to complete and [are] quite extensive." AR 573.

baselines, Ms. Millis responded in the negative.  Id. at 587.  Using R.H.'s reading goal as an example, Ms. Millis explained that "all [the IEP] gives is a broad reading score.  It doesn't say whether [R.H. is] able to read independently or whether he's able to use context clues."  Id. at 587–88.  According to Ms. Millis, the omission of appropriate baselines on R.H.'s IEP prevents an evaluator from tracking his academic progression.  Id. at 588.  She also disapproved of R.H.'s December 2013 IEP because its baselines gave no indication "of what he's able to do or not able to do."  Id. at 599.  Ms. Millis opined that R.H. should receive full-time specialized instruction – or 27.5 hours per week – to achieve the IEPs' prescribed goals, rather than the prescribed ten hours per week, id. at 589, and that "[R.H.] could have benefited from speech and language . . . [a]nd counseling, as well," id. at 593.  She further opined that R.H. "is actually 6 to 9 years behind" other students his age.  Id. at 605.

As for R.H.'s post-secondary goals, Ms. Millis testified that the January 2013 IEP's transition plan was inappropriate because "[it was] not based on anything . . . except for a Woodcock-Johnson . . . and a BRIGANCE."  Id. at 594.  She also found the December 2013 IEP's transition plan to be inappropriate because "basically[,] it's the same exact plan as" the one used in January 2013.  Id. at 603.  Regarding both IEPs, Ms. Millis testified that R.H. required an eleven-month instructional program to catch up to his peers.  Id. at 596, 604.  She further testified that "[R.H.] needs far more than" the few hours of transition assistance that R.H.'s IEPs currently prescribed.  Id. at 595.  Ms. Millis opined that R.H. has made no progress at Eastern, "based on both his report card and the fact that he's only earned four credits in three years."  Id. at 605.  Additionally, Ms. Millis submitted that Eastern cannot meet R.H.'s particular needs because the school cannot offer full-time special education services or a vocational program.  Id. at 606.

To address R.H.'s academic and vocational needs, Ms. Millis recommended that he attend New Beginnings because that school offers an eleven-month instructional program and full-time special education services in a small-class setting. Id. at 607.  Ms. Millis also calculated the amount of specialized instruction that R.H. would need as compensatory education. Id. at 610.  Assuming that R.H. had required full-time specialized instruction for both the 2012–2013 and 2013–2014 school years, Ms. Millis testified that he was deprived of 1,100 hours of instruction for each year, or 2,200 hours total. Id.  By contrast, she testified that a total of 800 hours of specialized instruction were withheld from R.H. during those school years based on the prescriptions of the January and December 2013 IEPs, which mandated ten hours of specialized instruction per week. Id. at 610–11.  She ultimately recommended that R.H. should receive 200 total hours of compensatory education, in the form of one-on-one tutoring, because of "[t]he lack of specialized instruction that he received." Id. at 610.[22]  Ms. Millis further recommended that R.H. receive 100 hours of counseling under this plan, "based on [R.H.'s] lack of anything at all." Id. at 611.

### e.    Travis Cox's Testimony

On August 8, 2016, Mr. Cox telephonically appeared as a witness on behalf of DCPS, testifying in his capacity as R.H.'s case manager during the 2012–2013 school year and his reading teacher during the 2013–2014 school year. Id. at 655–736.  As R.H.'s reading teacher for that year, Mr. Cox submitted that he taught R.H. every other day for eighty minutes in a small-class setting of five students. Id. at 659.  When asked about R.H.'s conduct in that class,

---

[22] Ms. Millis did not explain how she arrived at her value of 200 hours of compensatory tutoring, but it appears that this number represents one-fourth of the total hours of specialized instruction withheld from R.H.'s IEP provisions during the 2012–2013 and 2013–2014 school years.  Plaintiffs' counsel explained during the July 22, 2016 hearing that "[v]ery common formulas were 4-to-1 or 5-to-1 classroom hours to tutoring hours. . . . [I]t is very common for a comp ed [sic] award in tutoring hours to be far less than what was missed in classroom hours." Hrg. Tr. at 65.

Mr. Cox responded that "[he] never had any behavioral issues with [R.H.] . . . [R.H.] is quiet and . . . tries to get the students to focus on what's going on. . . . [R.H.] is a respectful guy." Id. at 670.  Mr. Cox opined that R.H. "was probably one of the top students" in that class, and "[t]he only reason that he maybe didn't get a higher grade is because he was missing so much class." Id. at 671.  Mr. Cox also submitted that, during the 2013–2014 school year, R.H. was enrolled in a developmental or "resource" geometry class but he did not know "the specifics of that class" or whether it was taught out of the general education setting.  Id. at 661–62.

Mr. Cox also testified with respect to R.H.'s January 2013 IEP, which Mr. Cox wrote and developed during the 2012–2013 school year.  Id. at 667–68.  To develop this IEP, Mr. Cox explained that he interviewed R.H. about his career interests and gave him a WJ-III ACH and a BRIGANCE E–2 assessment, id. at 668, all of which are assessments that Mr. Cox normally administers to ninth-graders, id. at 667.  Mr. Cox agreed, however, that the BRIGANCE E–2 assessment was considered a vocational level I assessment.  Id. at 700.  After obtaining the results from those assessments, Mr. Cox met with other members of the IEP Team to create R.H.'s January 2013 IEP.  Id.  The members decided to prescribe ten hours of specialized instruction per week for R.H. outside the general education setting because "he had good fluency in reading but . . . [needed] special help with decoding and reading text above . . . his grade level."  Id. at 675.

Apart from the IEP, Mr. Cox testified that R.H. received one-on-one tutoring for reading during the 2012–2103 school year because his reading teacher "had a very small class," but Mr. Cox knew of no other class in which R.H. received one-on-one service.  Id. at 702.  When asked to compare R.H.'s reading skills to those of other students, Mr. Cox opined that R.H. possesses "much higher basic reading skills" than the students for whom Eastern provides full-time

specialized instruction.  Id. at 676.  When asked about assessing R.H.'s baselines and goals from the January 2013 IEP, Mr. Cox responded that, for example, the WJ-III ACH showed "where [R.H.'s] foundational math skills were."  Id. at 718.  Mr. Cox added that the WJ-III ACH lacks "specific information about percentage[s]," so supplying a numeric quantification for R.H.'s baseline abilities "would be impossible" using that test.  Id.  Thus, Mr. Cox explained, R.H.'s progress may not be tracked "just by reading the IEP," id. at 717, but his progress can be measured by "how [R.H.] does in the classroom, exit slips, homework assignments, quizzes, [and] tests," id. at 716.

R.H.'s January 2013 IEP also included transportation services and a transition plan, which Mr. Cox testified were both included to help encourage R.H. to attend school.  Id. at 678–79, 681–82.  Regarding the transportation services, Mr. Cox explained that they were included because Plaintiffs had insufficient funds and Ms. Hill "had significant disabilities" that prevented her from bringing R.H. to school.  Id. at 678.  As for the IEP's transition plan, Mr. Cox explained that he intended to pull R.H. from class for short intervals to work on R.H.'s transition goals, and other teachers had agreed to encourage R.H.'s participation in their sponsored extracurricular activities.  Id. at 681–82.[23]  However, Mr. Cox testified that "[R.H.'s] attendance prevented [Mr. Cox] from implementing [the transition] goals . . . because when [R.H.] did come to school . . . [Mr. Cox] wanted him to" prioritize his academic work.  Id. at 704.  Mr. Cox submitted that, during the 2012–2013 school year, R.H. missed 97.5 days of instruction.  Id. at 665.  By contrast, R.H.'s attendance improved during the 2013–2014 school year, id. at 687, missing nineteen days

---

[23] During cross-examination, Mr. Cox admitted that these activities required a 2.0 GPA, which was significantly higher than R.H.'s GPA, AR 710, but Mr. Cox later clarified that some club sponsors were willing to make an exception if R.H. maintained satisfactory attendance, id. at 735.

of instruction, but Mr. Cox explained that missing even six days of school presents "a significant challenge to catch up with" schoolwork, id. at 665.

Mr. Cox testified at length regarding R.H.'s attendance record and how it related to R.H.'s transportation difficulties. Mr. Cox first explained that, during the 2013–2014 school year, he coordinated with R.H.'s new case manager to provide R.H. with free "transit passes" from Eastern's attendance office and "student Metro cards" from Eastern's administrative office. Id. at 695–96. Mr. Cox then stated that he "followed up a couple times with [R.H.]" regarding those passes and Metro cards, but eventually those arrangements "just didn't work out." Id. at 696. When asked why R.H.'s transportation services were removed from his IEP, Mr. Cox testified that "the requirements had changed[.] [DCPS] had . . . elevated the requirements for receiving transportation." Id. According to Mr. Cox, members of R.H.'s December 2013 IEP Team "determined that [R.H.] was no longer eligible for receiving transportation." Id. at 697.

Mr. Cox also responded to questions concerning R.H.'s mental state and what R.H.'s IEP Team did "to address his depressed mood or lack of motivation." Id. at 732. For the 2013–2014 school year, Mr. Cox testified that "[R.H.] was taken to [Mr. Cox's] class at various points to meet with the social worker." Id. When asked whether counseling was part of R.H.'s IEP, Mr. Cox explained that even if the IEP lacked that service, "[R.H.] did this meeting with [the social worker] throughout the year." Id. at 733. Additionally, Mr. Cox asserted that he thinks "it's possible" for R.H. to graduate from Eastern, id. at 706, and that "[R.H.] wants to get a high school degree and . . . some sort of practical training that will help him get a job," id. at 734.

### D.     The Hearing Officer's Decision

On August 12, 2014, following the due process hearing, the hearing officer issued an HOD that denied all of Plaintiffs' requested relief. Id. at 3–13. In the decision, the hearing

officer compressed the ten issues raised in Plaintiffs' due process complaint into three general categories.  See id.  She ultimately issued an order that denied all of Plaintiffs' requested relief, finding that they had failed to meet their burden of proof with respect to each of the ten issues. Id.  The Court's assessment of the inadequacy of the HOD was fully set out in its prior Report and Recommendation and will not be repeated here.  See R&R.

### E.    Plaintiffs' District Court Complaint

On November 10, 2014, Plaintiffs filed the present action, requesting that this Court reverse the HOD.  Compl. at 4–5.  On appeal, Plaintiffs reincorporate the issues raised in their original due process complaint except their allegation that DCPS failed to provide Ms. Hill with access to R.H.'s records.  See Pl. Opp. at 14.  Both parties' motions for summary judgment are fully briefed and ripe for resolution.

### F.    The Court's Prior Report and Recommendation

The undersigned issued a Report and Recommendation on March 25, 2016, that recommended that the district judge originally assigned to this matter deny both parties' motions for summary judgment and remand the case for a new HOD.  R&R at 2.  The undersigned found that the HOD did not provide sufficient findings and reasoning so as to permit meaningful review.  Id. at 12.  Accordingly, the undersigned recommended remanding the matter back to the hearing officer for further consideration.  Id. at 22–23.

Thereafter, Plaintiffs objected to the Report and Recommendation because remand would "cause further delay in [R.H.'s] education."  Pl. Obj. at 2.  DCPS joined Plaintiffs in asking the Court to forgo remand and instead "decide the merits of this case based upon the current administrative record and the parties' summary judgment motions."  Def. Resp. at 1.  Both parties emphasized that remand would be inefficient because the hearing officer who presided

over the due process hearing no longer works for the Office of the State Superintendent for Education ("OSSE").  Pl. Obj. at 3; Def. Resp. at 2.  Accordingly, with the consent of the parties, this case was referred by the district judge to the undersigned for all purposes and to issue "a decision on the merits of [Plaintiffs'] claims and grant any appropriate relief."  Referral Order [Dkt. 21] at 2.

## LEGAL STANDARD

The IDEA provides judicial review of "the findings and decision made" by a hearing officer.  20 U.S.C. § 1415(i)(2)(A).  In reviewing these decisions, the district court has broad remedial authority to "grant such relief as the court determines is appropriate."  Id. § 1415(i)(2)(C).  Motions in IDEA cases, though framed as motions for summary judgment, generally seek the district court's review of an administrative decision.  S.B. v. Dist. of Columbia, 783 F. Supp. 2d 44, 50 (D.D.C. 2011).  The burden of proof is on the party challenging the administrative decision, who must "at least take on the burden of persuading the court that the hearing officer was wrong."  Reid ex rel. Reid v. Dist. of Columbia, 401 F.3d 516, 521 (D.C. Cir. 2005) (internal quotation marks omitted).  Generally, courts may not substitute their own views for those of the hearing officer.  See Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982).  However, a hearing decision "without reasoned and specific findings deserves little deference."  Kerkam v. Superintendent of D.C. Pub. Schs., 931 F.2d 84, 87 (D.C. Cir. 1991).  In such a case, the district court may review the plaintiff's IDEA claims de novo.  See Block v. Dist. of Columbia, 748 F. Supp. 891, 895 (D.D.C. 1990).

Courts apply a twofold inquiry when parents challenge the appropriateness of a student's program or placement under the IDEA.  See Rowley, 458 U.S. at 206–07.  First, the court asks whether the school district "complie[d] with the procedures set forth in the [IDEA]."  Id.

Second, the court asks whether the developed IEP is "reasonably calculated to enable the child to receive educational benefits." Id. If the court finds violations of the IDEA's procedures, a valid claim additionally requires those violations to affect the student's substantive rights. Lesesne ex rel. B.F. v. Dist. of Columbia, 447 F.3d 828, 834 (D.C. Cir. 2006).

## DISCUSSION

As a preliminary matter, the undersigned finds that the HOD is entitled to no deference in this case. The HOD consists of four pages of conclusory statements culminating in the hearing officer's denial of Plaintiffs' requested relief because "[R.H.] had a serious truancy problem." See AR 10–13. For the reasons stated in its prior Report and Recommendation, the Court finds no reason to accord the hearing officer any deference here. See generally R&R. Accordingly, the Court will conduct de novo review of the issues raised in Plaintiffs' Complaint.

### A.    Failure to Include Ms. Hill in the January and December 2013 IEP Meetings

Plaintiffs first point of contention alleges that DCPS failed to include Ms. Hill in the January 2013 and December 2013 IEP meetings. Pl. Mot. at 17. At the hearing on the parties' motions, Plaintiffs withdrew this allegation with respect to the January 2013 IEP meeting. Hrg. Tr. at 20. As for the December 2013 IEP meeting, DCPS conceded at the hearing that it denied R.H. a FAPE by "holding or scheduling [the December 2013] IEP meeting without [Ms. Hill] being there." Id. at 3. This concession is well taken. District regulations require DCPS to "ensure that one or both of the parents . . . are present at each IEP Team meeting or afforded the opportunity to participate[.]" See 34 C.F.R. § 300.322(a). DCPS' refusal to reschedule the December 2013 IEP meeting prohibited Ms. Hill's participation in the meeting, thereby denying R.H. a FAPE. See 20 U.S.C. § 1415(f)(3)(E)(ii)(procedural defect in an IEP results in a denial of a FAPE it if "significantly impeded the parents' opportunity to participate in the decision making

process regarding the provision of a free appropriate public education to the parents' child").  As

other Judges on this Court have observed, the "IEP is critical to the design and functioning of the

FAPE," Brown v. Dist. of Columbia, No. 15-0043 (RCL), 2016 WL 1452330, at *9 (D.D.C. Apr.

13, 2016), and the IDEA "requires school districts to involve parents in the creation of [IEPs]

tailored to address the specific needs of each disabled student."  N.S. ex rel Stein v. Dist. of

Columbia, 709 F. Supp. 2d 57, 70 (D.D.C. 2010).   Indeed, the Act "emphasizes the participation

of the parents in developing the child's educational program and assessing its effectiveness."

Town of Burlington v. Mass. Dep't of Educ., 471 U.S. 359, 369 (1985).  Accordingly, the Court

finds that DCPS denied R.H. a FAPE at least as of the December 19, 2013 IEP meeting.

> **B.      Failure to Authorize Evaluations of R.H.**

Plaintiffs assert that DCPS also failed to authorize evaluations of R.H. in 2013, including

speech-language and vocational language II assessments.[24]  Specifically, Plaintiffs contend that

Ms. Hill's August 1, 2013, request for DCPS to administer a comprehensive evaluation of R.H.

"trigger[ed] a specific statutory obligation to perform" the speech-language and vocational

evaluations.  Id. at 18; see Pl. Opp. at 10.  At the hearing, DCPS conceded an IDEA violation

with respect to this issue.  Hrg. Tr. 3, 40.  As DCPS now admits, when a parent requests an

evaluation, DCPS is "supposed to provide the evaluation and it clearly did not do that with

respect to the speech and language evaluation and the vocational evaluation."  Id.

Again, DCPS's concession is well taken.  The IDEA requires school districts to ensure

that students are "assessed in all areas of suspected disability" and to base the student's IEP on

---

[24] In passing, Plaintiffs also reference DCPS' failure to abide by an earlier request in 2012 for "triennial evaluations," including a comprehensive psychological evaluation.  See Pl. Mot. at 5.  Such a request, dated December 11, 2012, is indeed reflected in the record, AR 24.  But in response to this request, DCPS issued a psychological evaluation on March 4, 2013.  Id. at 58.  Thus, it appears that DCPS complied with Plaintiffs' request, which was made only a few weeks before the January 2013 IEP meeting.  Accordingly, the Court finds that Plaintiffs failed to prove that any harm flowed from the circumstances surrounding the 2012 request.  See Cooper v. Dist. of Columbia, 77 F. Supp. 3d 32, 37 (D.D.C. 2014).

the most recent evaluation.  20 U.S.C. §§ 1414(b)(3)(B), (c)(1); 34 C.F.R. § 300.304(c)(4).

Further, school districts must conduct an assessment of a student's educational needs if the

parent requests one even if the IEP Team finds that "no additional data are needed to determine"

those needs.  20 U.S.C. § 1414(c)(4)(B).  Students are also entitled to a re-evaluation of their

disability upon a parental request, provided that no re-evaluation occurs "more frequently than

once a year," though a requested re-evaluation must occur "at least once every 3 years."  34

C.F.R. § 300.303(a)(2); see Cartwright v. Dist. of Columbia, 267 F. Supp. 2d 83, 87 (D.D.C.

2003) ("DCPS' failure to comply with [the parent's] request clearly violates the language of [34

C.F.R. § 300.303].").  According to the record, R.H.'s last speech-language evaluation occurred

over twelve years ago, on March 9, 2004.  AR 60.  Therefore, DCPS had an obligation to

administer a speech-language reevaluation at Ms. Hill's request in August 2013.  See 34 C.F.R. §

300.303(a)(2).  Similarly, as it admitted at the hearing, DCPS was obliged to conduct a

vocational level II assessment of RH upon Ms. Hill's request because such an assessment was

necessary "to determine [his] educational needs."  See 34 C.F.R. § 300.305(d).

 Unavailing, however, is Plaintiffs' contention that DCPS was obligated to evaluate

R.H.'s speech language ability prior to Ms. Hill's August 1, 2013 request because "[s]peech-

language was an area of suspected disability [for R.H. given] that DCPS had previously

prescribed speech-language services" to him.  Pl. Opp. at 11.  It is true that, even absent a

parental request, the school district must assess a child "in all areas of suspected disability,"

which include "social and emotional status, general intelligence, academic performance, [and]

communicative status."  20 U.S.C. § 1414(b)(3)(B) (emphasis added); 34 C.F.R. § 300.304(c)(4).

But there is insufficient evidence in the record to support the conclusion that DCPS should have

suspected that R..H. had a speech language disability prior to Ms. Hill's August 2013 requests

for an evaluation.  Indeed, R.H.'s only speech language evaluation prior to that time was in March 2004, and the results of the evaluation included no recommendations regarding a disability.  AR 61 (stating the 2004 speech language evaluation indicated that R.H.'s "overall language abilities were in the average range and speech services were not recommended at that time"); see also id. at 124 (during October 10, 2013, MDT, Ms. Hill's represented that R.H. had received speech-language services for a 10-year-old speech impediment but that it "no longer affect[ed] his communication").  While the December 8, 2013 independent psychological evaluation indicated that R.H. may have had a speech language deficiency, DCPS did not receive that evaluation until four months after Ms. Hill's August 2013 request.  Id. at 101, 153; cf. Razzaghi v. Dist. of Columbia, No. Civ.A. 03-01619 HHK, 2005 WL 3276318, at *6 (D.D.C. Sept. 28, 2005) (finding no violation of the IDEA where the school district did not perform a speech-language evaluation before developing the student's current IEP because it only suspected a speech disability after implementing that IEP).

As for the vocational level II assessment, there is no record of R.H. ever receiving such an assessment.  Prior to the hearing, DCPS contended it was not obligated to provide the assessment to R.H. because the level II assessment was appropriate for an eleventh- or twelfth-grader, not a ninth grader like R.H.  Def. Reply at 7.  As DCPS conceded at the hearing, however, federal regulations specifically require the IEP Team to annually update "measurable postsecondary goals based upon age appropriate," not grade appropriate, transition assessments. 34 C.F.R. § 300.320(b)(1) (emphasis added); see also Gibson v. Forest Hills Local Sch. Dist., No. 14-3575, 2016 WL 3771843, at *11 (6th Cir. July 15, 2016) (interpreting 34 C.F.R. § 300.320 to mandate school districts to provide students with post-secondary goals based on age-appropriate assessments upon their sixteenth birthday). The record is clear that R.H. should have

received a vocational level II assessment when he turned sixteen in October 2012, regardless of the grade he was in.  AR 574 (Ms. Millis testifying that R.H. should have received a vocational level II assessment at sixteen-years-old to evaluate his "career management, career exploration[,] and career training"); Id. at 162 (independent psychological evaluation concluding that R.H. should receive a vocational level II assessment).

In sum, DCPS committed procedural violations of the IDEA both when it failed to provide R.H. with a vocational level II assessment upon R.H. turning sixteen in October 2012, and when it failed to provide him both a speech language and vocational level II assessments upon Ms. Hill's request in August 2013.  Further, denying R.H. these evaluations resulted in the substantive denial of FAPE.  See, e.g., Harris v . Dist. of Columbia, 561 F. Supp. 2d 63, 69 (D.D.C. 2008) ("[F]ailure to act on a request for an independent evaluation is certainly not a mere procedural inadequacy.").  R.H.'s December 2013 independent psychological evaluation observed that his oral language abilities were "in the Below Average range of functioning," and were only better than or equal to "that of 13% of children his age," and that his "scores on cognitive tests suggest difficulties with vocabulary and verbal comprehension." AR 153, 162. For this reason, it concluded that he should receive a speech language evaluation to ascertain the source of these difficulties and whether he "will require speech and language services in the school setting."  Id. at 162.  Similarly, it concluded that R.H. would also benefit from vocational training to "assist with his vocational goals, and the transition to independent living," and specifically recommended he receive the vocational level II assessment.  Id. at 161–62.

Because it failed to perform either necessary evaluation in time for them to be considered in developing the December 2013 IEP, DCPS denied R.H. a FAPE.  As another judge from this Court has observed, "an evaluation's primary role is to contribute to the development of a sound

IEP." Long v. Dist. of Columbia, 780 F. Supp. 2d 49, 60 (D.D.C. 2011). As the independent psychological evaluation recognized, both speech language and vocational level II evaluations were necessary in order to fashion an educationally beneficial IEP for R.H. AR 162. Without the benefit of reviewing the data from these evaluations, DCPS could not – and did not – properly fashion a legally compliant IEP for him in December 2013. It thereby significantly compromised his educational opportunities and denied him a FAPE.

C.      **Failure to Perform Adequate Evaluations of R.H.**

Plaintiffs also challenge the validity of the school-administered FBA and psychological evaluation in 2013. Pl. Mot. at 18. Plaintiffs allege that the December 1, 2013, FBA "did not include observations of R.H. or an 'ABC' analysis," both of which are "necessary parts of that assessment." See id. The District conceded at the hearing that the FBA was insufficient. Hrg. Tr. 38. As it fairly stated, DCPS "ha[s] to do a classroom observation [for a valid FBA] . . . . That's the whole point." Id. Indeed, the primary purpose of an FBA is to address a child's behavioral difficulties that impede his or her learning, which are identified by classroom observations. See supra n.3; see also Harris, 561 F. Supp. 2d at 67 ("The FBA is essential to addressing a child's behavioral difficulties[.]"). And, as before, because DCPS did not have the benefit of a properly conceived FBA prior to developing the December 2013 IEP, R.H. was denied a FAPE. DCPS failed to consider even the deficient FBA report that it did have at the December 19, 2013 IEP meeting, despite the fact that it had received the report as early as December 5, 2013. Hrg. Tr. at 49; AR 310.

Plaintiffs also allege that R.H.'s March 4, 2013, psychological evaluation was deficient because it "assessed only [his] IQ, not emotional and behavioral issues or even academic skills,

as necessary." Pl. Mot. at 18. The District does not concede this issue, and the Court finds that

Plaintiffs have not met their burden with respect to it.

Plaintiffs offer no legal support for their claim that psychological evaluations must

include social and behavioral issues and academic skills. Pl. Mot. at 18; see Damarcus S., 2016

WL 2993158, at *8 ("Plaintiffs have not identified any requirement that the evaluation offer a

particular analysis of the information . . . ."). In fact, the IDEA lacks specific parameters

regarding the content of psychological evaluations, or for that matter, of other evaluations. It

merely requires that such evaluations "use technically sound instruments that may assess the

relative contribution of cognitive and behavioral factors, in addition to physical or developmental

factors." 20 U.S.C. § 1414(b)(2)(C). Its implementing regulations provide only that students be

"assessed in all areas related to the suspected disability" and that such evaluations use "[a]

variety of assessment tools and strategies . . . to gather relevant functional and developmental

information about the child [. . .] that may assist in determining – [t]he content of the child's

IEP." 34 C.F.R. § 300.304(b)(1), (c)(4).

DCPS' March 2013 psychological evaluation meets this threshold. See 34 C.F.R. §

300.304(c)(4). According to the January 2013 IEP – formulated before DCPS' March 2013

psychological evaluation report – R.H. suffers from a specific learning disability, leading to

academic areas of concern in mathematics, reading, and written expression. AR 40–45, 58.

Thus, any subsequent evaluation would reasonably be limited to the extent of that specific

learning disability. See D.K. v. Abington Sch. Dist., 696 F.3d 233, 250 (3d Cir. 2012) (finding

that evaluations "should be tailored to the specific problems a potentially disabled student is

having" but not "designed to identify and diagnose every possible disability"). After

summarizing the information collected from results and interviews, the evaluation at issue found

R.H.'s academic, memory, and social-emotional difficulties to be consistent with his diagnosed learning disability.  AR 69–70; compare id. at 65–66 (assessing R.H.'s verbal and nonverbal reasoning and memory abilities), with 34 C.F.R. § 300.8(c)(10) (defining "specific learning disability" to involve the understanding and usage of spoken or written language).   The report then recommended several teaching strategies – including a more interactive, multimodal learning approach – to address R.H.'s difficulties in those areas of concern.  Id.  The Court finds nothing more was required under the IDEA to evaluate appropriately R.H.'s specific learning disability.  See 34 C.F.R. § 300.304(c)(4).

### D.    Failure to Timely Authorize R.H.'s IEE

Plaintiffs also contend that DCPS failed to timely authorize the IEE, including an independent psychological evaluation, that Ms. Hill requested on August 1, 2013.  Pl. Mot. at 19. Specifically, Plaintiffs claim that DCPS, without explanation, failed to respond to their request for eighty-one days.  Id.  The Court agrees and finds that DCPS' unexplained delay denied R.H. a FAPE because it prevented R.H.'s IEP Team from considering the evaluation results prior to issuance of his December 2013 IEP.

In general, if a parent disagrees with a school district's evaluation, the IDEA implementing regulations permit the parent to request "an independent educational evaluation at public expense."  34 C.F.R. § 300.502(b)(1).  Upon such a request, the school district "must, without unnecessary delay," either provide the independent evaluation or request a hearing to show why its original evaluation was appropriate.  Id. § 300.502(b)(2) (emphasis added).  The IDEA and its implementing regulations provide no additional guidance on what constitutes an "unnecessary delay."  Though vague, this Court has interpreted the statute and regulations as requiring "prompt resolution of disputes involving the educational placement of learning

disabled children."  Herbin ex rel. Herbin v. Dist. of Columbia, 362 F. Supp. 2d 254, 259–60

(D.D.C. 2005).  But while such an undue delay constitutes a procedural violation of the IDEA, it

does not "inexorably lead a court to find a child was denied FAPE."  Smith v. Dist. of Columbia,

No. 08-2216, 2010 WL 4861757, at *3 (D.D.C. Nov. 30, 2010).  Rather, the procedural violation

must have affected the child's substantive rights.  Id.  "A delay does not affect substantive rights

if the student's education would not have been different had there been no delay."  D.R. ex rel.

Robinson v. Gov't of Dist. of Columbia, 637 F. Supp. 2d 11, 18 (D.D.C. 2009).  On the other

hand, "[a] delay of more than 2–3 months is likely fatal to the [school] district's case, although

the exact length will depend on the circumstances rather than being a bright-line test."  Perry A.

Zirkel, Independent Educational Evaluation Reimbursement Under the IDEA:  An Update, 306

Educ. L. Rep. 32, 35 (2014).

Here, Plaintiffs submitted their request for an IEE on August 1, 2013, in part because

they were dissatisfied with DCPS's March 2013 psychological evaluation.  AR 110, 276, 303.

Inexplicably, at least eighty-one days elapsed before DCPS authorized the independent

psychological evaluation on October 21, 2013.  Pl. Mot. at 19; see AR 582–83.  DCPS offers no

explanation for the delay, nor any authority in support of its contention that its response was

timely.  See Def. Mot. at 16.  Plaintiffs' expert, Ms. Millis, offered uncontroverted testimony that

delays longer than three weeks are outside the norm.  AR 583.  Because DCPS offers no

explanation for the 81-day delay, the Court finds that it was unreasonable and amounted to a

procedural violation of the IDEA.  See 34 C.F.R. § 300.502(b)(2).

Having found a procedural violation, the Court next considers whether it substantively

harmed R.H.'s right to a FAPE.  See Robinson, 637 F. Supp. 2d at 18; see also Lesesne, 447 F.3d

at 834.  Under the circumstances of this case, the Court finds that the 81-day delay did so

because it prevented R.H.'s IEP Team from considering and including the independent

psychological evaluation's results in his December 19, 2013, IEP.  AR 299; cf. A.I. ex rel.

Iapalucci v. Dist. of Columbia, 402 F. Supp. 2d 152, 165 (D.D.C. 2005)  (finding no harm to a

student's education because the school district became aware of the IEE's results and

incorporated them into the student's IEP program).  Indeed, the results were not received by the

IEP Team until one day prior to the IEP meeting.  Id.  For that reason, the Team elected not to

review them.  Had DCPS not delayed authorizing the IEE for eighty-one days, the independent

psychological evaluation certainly would have been completed and received by the IEP Team in

time for its consideration in formulating R.H.'s December 2013 IEP.  Moreover, DCPS made no

efforts to cure the negative impact of  its delay.  Despite promising to do so, DCPS never

reconvened the IEP Team to address the evluation's assessment of R.H.'s educational needs.  AR

298.  Nor did DCPS ever "develop a written document to amend or modify [R.H.'s] current IEP"

in lieu of another IEP meeting, pursuant to the IDEA.  See 20 U.S.C. § 1414(d)(3)(D).

          And the results of the independent psychological evaluation were significant.  The

evaluation provided a thorough assessment of R.H.'s academic deficits and many important

recommendations regarding re-formulating his IEP so that he might achieve the education and

skills he will need to become a productive member of society, including:  (1) to continue his

enrollment in special education classes; (2) to update his IEP to include an emotional disturbance

classification; (3) to provide him intensive, full-time specialized education in a small class

setting so that he might catch up with his peers; (4) to enroll him in a full-time vocational school;

(5) to provide him with out-of-school tutoring on the academic subjects where he has fallen

behind and in-school counseling to address his emotional needs; and to give him both (6) a

vocational level II and (7) speech-language assessments.  AR 161–62.  None  of these

recommendations were considered in formulating the R.H.'s December 2013 IEP because they were not furnished to the IEP Team in time for their consideration.  Id. at 167–81.  Accordingly, the Court finds that DCPS' 81-day delay in authorizing the independent psychological evaluation ultimately caused a deprivation of R.H.'s educational benefits.

### E.       Failure to Base R.H.'s IEPs on Current Evaluations

Plaintiffs also assert that DCPS failed to base R.H's January and December 2013 IEPs "on current evaluations" as required by the IDEA.  Pl. Mot. at 19.  Plaintiffs contend that the December 2013 IEP was developed without reviewing his much-delayed independent psychological evaluation which was completed shortly before the December 2013 IEP meeting. Id.  DCPS concedes this allegation, see Hrg. Tr. at 3, and the Court finds, for the same reasons stated previously, that it is well-founded and amounted to a denial of FAPE.  With respect to the January 2013 IEP, however, the Court finds that DCPS based the January 2013 IEP on R.H.'s then-current evaluations.  Accordingly, Plaintiffs have not met their burden with respect to that claim.

When developing a child's IEP, the IEP Team is obligated to consider, among other things, "the results of the initial evaluation or the most recent evaluation of the child."  20 U.S.C. § 1414(d)(3)(A)(iii).  Additionally, the IEP Team must "[r]eview existing evaluation data on the child" as part of any re-evaluation, including information and evaluations from the parent, assessment results, and classroom observations.  34 C.F.R. § 300.305(a)(1).  Here, Plaintiffs have not identified any evaluation of R.H. that was not considered by his January 2013 IEP Team. That IEP was based not only on R.H.'s academic performance, but also on the results of WJ-III ACH and BRIGANCE E-2 evaluations administered on December 18, 2012.  AR 50. While Plaintiffs assert these evaluations did little more than assess R.H.'s academic

performance, in contravention of the IDEA, Pl. Opp. at 7–8, these evaluations in fact assessed

more than than that.  The WJ-III ACH evaluated not only R.H.'s abilities in his three academic

areas of concern – mathematics, basic reading, and written expression – but also supplied

information relating to his post-secondary transition plan and independent living.  Id. at 42–44,

50.  Likewise, the BRIGANCE E–2, and information collected from R.H.'s reported interests,

further informed R.H.'s post-secondary transition goals set out in the January 2013 IEP.  Id. at

50–53.  The Court thus finds that Plaintiffs have not met their burden to prove that DCPS failed

to consider the results of his most recent evaluations with respect to that IEP.

### F.      Failure to Develop IEPs Appropriate for R.H.

Plaintiffs also challenge the sufficiency of both R.H.'s January and December 2013 IEPs.

Pl. Mot. at 15.  The District properly concedes that the December 2013 IEP was invalid because

DCPS excluded Ms. Hill from the IEP development process and failed to consider R.H.'s

independent psychological and FBA evaluations when formulating the IEP.  Hrg. Tr. at 3-5, 51.

Therefore, the Court will only address this argument as it relates to R.H.'s January 2013 IEP.

Plaintiffs contend that the January 2013 IEP was inadequate because it prescribed "too

few hours of specialized instruction, insufficient [transitional] services, an inappropriate setting,

and inappropriate goals and baselines."  Pl. Opp. at 1.  Plaintiffs' challenge to the transitional

services offered in the January 2013 IEP flows from DCPS' failure to conduct a vocational level

II assessment of R.H. prior to developing the IEP.  Pl. Mot. at 15.  As the Court found

previously, DCPS impermissibly withheld that assessment from R.H.  Because that failure

impeded the development of appropriate transition services within the January 2013 IEP, it thus

resulted in denying R.H. a FAPE.  See G.G. ex rel. Gersten v. Dist. of Columbia, 924 F. Supp. 2d

273, 280 (D.D.C. 2013) ("Failure to develop an IEP is essentially a denial of a FAPE.").

Plaintiffs' other challenges to the adequacy of R.H.'s January 2013 IEP fail, however.  In support of their argument that the January 2013 IEP prescribed too few hours of specialized instruction, Plaintiffs invoke the expert testimony of Ms. Millis and the recommendations proposed in the independent psychological evaluation, both of which asserted that R.H. should receive full-time specialized instruction, rather then the ten hours per week prescribed in the January 2013 IEP.  AR 589, 161–62.  According to the IEP, the IEP Team decided to increase R.H's specialized instruction from five to ten hours per week in January 2013 based on his WJ-III ACH results, and because the "inclusion support" in the general education classroom appeared to be insufficient for his needs.  Id. at 46–47, 675.  The Court cannot say, based on the record before it, that that judgment was wrong at the time it was made.  It may be that R.H.'s January 2013 IEP was insufficient for his needs, but the Plaintiffs have not demonstrated that based on the record before the Court.  See Dixon v. Dist. of Columbia, 83 F. Supp. 3d 223, 231 (D.D.C. 2015) (denying the plaintiff's request for full-time specialized instruction because she failed to present supportive testimony).

Indeed, a properly developed IEP "need not guarantee the best possible education or even a 'potential-maximizing' one." Leggett v. Dist. of Columbia, 793 F.3d 59, 70 (D.C. Cir. 2015) (quoting Rowley, 458 U.S. at 207).  Rather, an IEP must only be "reasonably calculated to enable the child to receive educational benefits." Id.; see M.H. v. Pelham Union Free Sch. Dist., No. 15 Civ. 00060 (RMB), 2016 WL 2353949, at *5 (S.D.N.Y. Mar. 7, 2016) ("The IDEA calls only for selection of a program that provides a basic floor of opportunity, that is likely to produce progress, not regression.") (internal quotation marks omitted).  As long as the IEP "enable[s] the child to achieve passing marks and advance from grade to grade" in the "least restrictive

environment," it is appropriate.  K.S. v. Dist. of Columbia, 962 F. Supp. 2d 216, 220 (D.D.C.

2013).

      In light of these principles, the Court finds that Plaintiffs have not met their burden to

demonstrate that the number of specialized education hours prescribed in the January 2013 IEP

were not reasonably calculated to confer educational benefits on R.H. given what was known

about R.H. at the time the IEP was developed.  The independent psychological evaluation on

which Plaintiffs rely for their argument, for instance, was requested in August 2013 and not

completed until December 2013, long after the January 2013 IEP was developed.  AR 147.  Ms.

Millis' assessment also did not exist in January 2013.  This Court will not hold DCPS to task

based on evaluations and recommendations reached months after the IEP Team in question met.

See Diatta v. Dist. of Columbia, 319 F. Supp. 2d 57, 64 (D.D.C. 2004) ("[D]enial of FAPE

[begins] to accrue when the school district knew or should have known . . . [about the]

inappropriate education.").

      Similarly unavailing is Plaintiffs' contention that the January 2013 IEP failed to prescribe

necessary counseling services for R.H.  Pl. Mot. at 15.  Plaintiffs rely in support of their

argument (again) on the December 2013 independent psychological evaluation, on the March

2013 comprehensive psychological evaluation, and on Ms. Hill's request for such services on

October 10, 2013, all of which post-date the January 2013 IEP by anywhere from three to eleven

months.  AR 70, 162, 518.  DCPS could not have reasonably suspected that R.H. required

counseling services before March 4, 2013 – the date of its psychological evaluation which first

recommended those services.  AR 70.  Indeed, Plaintiffs themselves raised no objections to the

lack of counseling services (or any other alleged omission by the IEP Team) until long after the

January 2013 IEP was developed.  See Munir v. Pottsville Area Sch. Dist., No. 3:10–cv–0855,

2012 WL 2194543, at *16 (M.D. Pa. June 14, 2012) (denying the plaintiff's requested relief while emphasizing the parent's lack of objection when the IEP did not contain counseling services).  Therefore, the Court finds that Plaintiffs have not met their burden of proof with regard to this alleged deficiency in the January 2013 IEP either.

Finally, Plaintiffs allege that the January 2013 IEP contained "unusably inappropriate" goals and baselines.  Pl. Mot. at 15.  According to Plaintiffs' expert, all the January 2013 IEP reading baseline gives is a "broad reading score.  It doesn't say whether [R.H. is] able to read independently or whether he's able to use context clues."  AR 587–88.  But IEP baselines need not be so detailed.  Rather, they must only include "how [R.H.'s] disability affects [his] involvement and progress in the general education curriculum."  See 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa).  The IEP must also include a "statement of measurable annual goals, including academic and functional goals designed to (a) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and (b) meet each of the child's other educational needs that result from the child's disability."  Id. § 1414(d)(1)(A)(i)(III).

Plaintiffs point to no evidence demonstrating that baselines and goals in the January 2013 IEP were not reasonably calculated to confer an educational benefit on R.H.  Indeed, the IEP includes a section for each area of academic concern – mathematics, reading, and written expression – and describes how R.H.'s disability in each area affects his progress in the general education curriculum.  AR 42–45 (e.g., "R.H.'s deficits with multi-digit subtraction, adding fractions, and multi-digit multiplication prevent him from accessing and mastering higher level concepts in algebra.").  Moreover, the IEP includes several annual goals for each subject matter affected by R.H.'s disability.  For example, for mathematics, the IEP designates the following

three annual goals:  (1) "R.H. will be able to correctly borrow in double-digit subtraction in at

least four out of five trials"; (2) "R.H. will be able to correctly multiply a double-digit number by

a single-digit number in at least four out of five trials"; and (3) "R.H. will be able to correctly

add fractions in at least four out of five trials."  Id. at 42–43.  This Court therefore finds no

violation of the IDEA in this regard.  See Gavrity v. New Lebanon Cent. Sch. Dist., No. 1:05–

CV–1024 (NAM/DRH), 2009 WL 3164435, at *25 (S.D.N.Y. Sept. 29, 2009) (rejecting the

plaintiff's argument that the absence of a specific baseline renders the IEP inadequate).

### G.     Failure to Implement R.H.'s January and December 2013 IEPs

 Plaintiffs also assert that DCPS failed to implement R.H.'s January and December 2013

IEPs "by providing almost nothing" of what was required by his IEPs for the 2012–2013 and

2013–2014 school years.  Pl. Mot. at 20.  In its defense, DCPS claims that implementation of

R.H.'s IEPs was difficult because of his "poor attendance."  Def. Mot. at 18.  Ultimately, the

Court finds that, even taking into account R.H.'s attendance record, DCPS failed to implement

significant portions of his IEPs during both relevant school years, thus denying him a FAPE.

Once a student's IEP is developed, the school district "must ensure that . . . special

education and related services are made available to the child in accordance with the child's

IEP."  34 C.F.R. § 300.323(c)(2).  Since a "de minimis failure to implement all elements of [an]

IEP" does not violate the IDEA, the plaintiff must "demonstrate that the [school district] failed to

implement substantial or significant provisions of the IEP."  Wilson v. Dist. of Columbia, 770 F.

Supp. 2d 270, 274 (D.D.C. 2011).  In other words, the school district must have committed

"[material] deviations from the IEP's stated requirements" for the plaintiff to recover under the

IDEA.  See Catalan ex rel. E.C. v. Dist. of Columbia, 478 F. Supp. 2d 73, 76 (D.D.C. 2007).

While this Circuit requires the plaintiff to demonstrate more than a mere difference between the

hours of service provided by the school district and the hours prescribed in the student's IEP, see

Savoy v. Dist. of Columbia, 844 F. Supp. 2d 23, 34 (D.D.C. 2012), it does not require proof that

the student suffered "demonstrable educational harm" for the plaintiff to prevail, see Wilson, 770

F. Supp. 2d at 275.  The Court's failure-to-implement inquiry "focuse[s] on (1) the proportion of

services mandated to those actually provided, and (2) the goal and import (as articulated in the

IEP) of the specific service that was withheld."  Id. (citing Van Duyn ex rel. Van Duyn v. Baker

Sch. Dist. 5J, 502 F.3d 811, 822 (9th Cir. 2007)).  Further, the Court focuses solely on whether

the school district provided the student with the opportunity to receive the prescribed educational

services and not whether the student actually took advantage of those services.  Joaquin v.

Friends Pub. Charter Sch., No. 1:14–01119 (RC), 2015 WL 5175885, at *8 (D.D.C. Sept. 3,

2015).  "To hold otherwise would be to transform the IDEA into a protector of outcomes rather

than opportunities[.]"  Id.

       1.     2012–2013 School Year

Plaintiffs raise three allegations concerning the implementation of R.H.'s IEP during the

2012–2013 school year.  First, they assert that DCPS provided no education at all, general or

special, for the first forty-five days of the year because R.H. was prohibited from attending

Eastern during that time.  Pl. Mot. at 20.  Second, Plaintiffs submit that DCPS failed to provide

R.H. with any special education classes prescribed in his IEP for the remainder of the 2012–2013

school year.  Pl. Mot. at 20.  Third, Plaintiffs contend that DCPS failed to provide R.H. with his

prescribed transportation services.  Pl. Mot. at 21.  The Court reviews each allegation in turn.

According to Plaintiffs, DCPS did not provide R.H. with any education during the first

forty-five days of the 2012–2013 school year because R.H. purportedly resided outside of

Eastern's enrollment boundary.  AR 511, 535.  The record suggests that R.H. may have been

homeless during this period.  Id. at 149 (noting that R.H. and his family were homeless from

2011–2013).  Whatever the reason, it is undisputed that R.H. received no home instruction

during this period and was not permitted to attend Eastern, or any other school, until Ms. Hill

spoke directly with the District of Columbia School Board.  Id. at 511.  However, the record does

not include the operative IEP for the first half of the 2012–2013.  Thus, the Court has no basis on

which to assess Plaintiffs' claim that R.H. was denied a FAPE during this 45-day period with

respect to R.H.'s specialized education.  Accordingly, the Court will deny Plaintiffs relief with

respect to this period.

Plaintiffs next contend that, during the second half of the 2012–2013 school year, DCPS

failed to provide R.H. with the full ten hours of specialized education that he was entitled to

under his January 2013 IEP.  Pl. Mot. at 20; see also AR 47.  Indeed, R.H. testified during the

administrative hearing that he was only enrolled in general education classes for the 2012–2013

school year, and that DCPS did not provide him with any specialized instruction.  AR 537.  Mr.

Cox, who was R.H.'s case manager during that school year, essentially confirmed that testimony.

According to Mr. Cox, R.H. only received in-class tutoring for his "very small [reading] class"

and that he knew of no other classes in which R.H. received any assistance.  Id. at 702.

Providing tutoring within a general education class is not the equivalent of the specialized

education outside the general education environment which R.H.'s IEP required.  See id.

Because the proportion of prescribed services actually provided to R.H. was at or near zero, the

Court finds that he was denied a FAPE for the second half of the 2012–2013 school year.  See

Joaquin, 2015 WL 5175885, at *77 (granting the parent summary judgment because "[t]he

proportion of services mandated to those actually provided was zero").

Finally, Plaintiffs contend that DCPS failed to provide R.H. with his prescribed transportation services during the spring semester of the 2012–2013 school year.  Pl. Mot. at 21.  The record reveals that R.H.'s January 2013 IEP prescribed that DCPS provide him with Metro transportation to Eastern.  AR 49.  Mr. Cox, who developed the IEP, testified that R.H. received transportation services due to his family's low income status and Ms. Hill's "significant disabilities," which prevented her from bringing R.H. to school.  Id. at 678.  According to R.H., DCPS provision of transportation services during the 2012–2013 school year was inconsistent, leaving Ms. Hill to fill in the gaps.  Id. at 536.  However, nowhere in the record do Plaintiffs specify how often DCPS failed to provide him with Metro transportation to school.  Further, R.H. admitted that a free bus was also available, but he was "not always up to make the free bus."  Id.  Thus, while it appears that DCPS did not always provide R.H. with Metro transportation to school in the 2013 spring semester, the record is insufficient for the Court to determine that that deficiency resulted in a material deviation from R.H.'s January 2013 IEP, thereby denying him a FAPE.  See Catalan, 478 F. Supp. 2d at 76; cf. Turner v. Dist. of Columbia, 952 F. Supp. 2d 31, 40–41 (requiring quantitative evidence to prove by a preponderance of the evidence that the student's specialized instruction was not implemented) (citing 20 U.S.C. § 1415(i)(2)(C)).[25]

2.      2013–2014 School Year

Plaintiffs also allege that DCPS provided only "some" of R.H.'s prescribed special education for the 2013–2014 school year, thus failing to implement the January and December 2013 IEPs.  Pl. Mot at 20.  Those IEPs prescribed ten hours, or 600 minutes, per week of specialized instruction.  AR 47, 174.  According to Mr. Cox, R.H. was provided such specialized

---

[25] The record is similarly deficient concerning DCPS's provision of transportation services during the 2013-2014 school year.

instruction in a developmental reading class that met every other day for eighty minutes during the 2013–2014 school year.  Id. at 661–62, 659; Def.'s Mot. at 9.  There is no evidence in the record of the length of any other specialized instruction that R.H. was provided.  Hrg. Tr. at 51–53.  Therefore, R.H. received anywhere from 160 minutes to 240 minutes of specialized instruction each week, depending on whether his reading class met two or three times a week. This equates to approximately 6 to 7.3 fewer hours than the amount of specialized education prescribed in either his January or December 2013 IEPs.  See id. at 47, 174.

The Court finds that DCPS denied R.H. a FAPE by providing him far fewer hours of specialized instruction per week during the 2013–2014 school year than his IEPs prescribed.  See Turner, 952 F. Supp. 2d at 40–41 (collecting cases in which courts found a material failure to implement IEPs when the school districts provided five to eleven hours less than their prescriptions); see also Savoy, 844 F. Supp. 2d at 34 (finding no material deviation from a student's IEP when the school district provided only one hour less per week of specialized instruction than the IEP prescribed).  Unlike the student in Savoy, who received 27.7 hours of specialized instruction per week instead of the 28.5 hours which had been prescribed, Savoy, 844 F. Supp. 2d at 33, R.H. received an average of 3.3 hours per week instead of the mandated ten hours prescribed for the 2013–2014 school year.  AR 659.  Considering the relatively small number of hours which were initially prescribed, falling significantly short of that number constitutes "a 'complete failure' to implement a student's IEP[,] [which] is 'undoubtedly' a denial of an appropriate education under the IDEA."  Wilson, 770 F. Supp. 2d at 277 n.1 (quoting Abney ex rel. Kantor v. Dist. of Columbia, 849 F.2d 1491, 1496 n.3 (D.C. Cir. 1988).

3.      Failure to Implement R.H.'s Transition Services During Both School
        Years

Additionally, Plaintiffs argue that DCPS failed to implement "any of the very modest

transitional services prescribed during either school year" for R.H's post-secondary goals.  Pl.

Mot. at 20.  Specifically, the January 2013 IEP required one hour per year of teacher-led research

of entrance requirements for technical training programs, one hour per month of assistance with

job interviews, and one hour per year of assistance with developing a budget.  Id. at 50–53.  The

December 2013 IEP required one hour per year of teacher-led research of entrance requirements

for community college programs, three hours per year of researching entrance requirements for a

landscaper, and one hour per year of researching the DMV website.  Id. at 178–81.  The parties

do not dispute that R.H. received none of these prescribed transition services or any vocational

courses or other programs that could supplement for the lack of transition services.  See id. at

50–53, 178–181, 704.  The Court finds that the school district's failure to provide any transition

services qualified as a material deviation from R.H's IEPs.  See Joaquin, 2015 WL 5175885, at

*7.  R.H.'s IEPs merely required a handful of hours of transition services per year, and DCPS did

not provide a single hour.  In doing so, it denied R.H. a FAPE.  See id.

   **H.      Remedy**

In sum, the Court finds that DCPS denied R.H. a FAPE because it:  failed to include Ms.

Hill in the December 2013 IEP meeting; failed to perform a speech language and vocational

level II assessments; failed to perform an adequate FBA; failed to timely authorize the

independent psychological evaluation; failed to base R.H.'s 2013 IEP on current evaluations;

failed to develop an appropriate IEP in December 2013; failed to implement the January 2013

IEP during the second half of the 2012-2013 school year and the first half of the 2013-2014

school year; and failed to implement the December 2013 IEP during the second half of the 2013-2014 school year.

Having found a denial of FAPE, the Court could remand this matter to the hearing office to determine appropriate relief.  See, e.g., Reid, 401 F.3d at 526 (after finding denial of FAPE, district court may remand to hearing officer for further proceedings to determine appropriate compensatory award where record is undeveloped).  The Court opts not to do so in this case because it has little confidence based on the record that any such award would fairly compensate R.H. for the educational deprivations he has suffered.  Moreover, remanding this matter would further expend the one thing R.H. may have the least of concerning his secondary school education:  time.  As a 19-year-old high school student, the opportunity to correct for past deficiencies in his educational program is rapidly coming to a close.  Indeed, R.H. is eligible to receive a FAPE for only two-and-a-half more school years.  See 5–E DCMR § 3002.1(b) ("A child with a disability . . . shall remain eligible [for special education and related services] through the end of the semester he or she turns twenty-two.");  Branham v. Gov't of Dist. of Columbia, 427 F.3d 7, 13 (D.C. Cir. 2005) (encouraging district court to award equitable relief itself rather than remand to the hearing officer where "in light of the educational harms [the student] has already suffered" and "to minimize the potential for further delay").  Finally, there is no need to remand this case.  Both parties had a full and fair opportunity during the administrative proceeding to develop the record as to any compensatory education award due R.H.  Accordingly, the Court will exercise its discretion to "grant such relief as [it] determines is appropriate" based on the record before it which it deems adequate to the task.  20 U.S.C. § 1415(i)(2)(C)(iii).

The IDEA prescribes "broad discretion" to the Court in fashioning the relief with which it provides.  Town of Burlington, 471 U.S. at 369.  "[J]ust as IEPs focus on disabled students' individual needs, so must awards compensating past violations rely on individualized assessments."  Reid, 401 F.3d at 524.  The Court's remedial inquiry is therefore fact-specific and equitable, "produc[ing] different results in different cases depending on the child's needs."  Id. Relief in the form of compensatory education must be "an informed and reasonable exercise of discretion regarding what services [the student] needs to elevate him to the position he would have occupied absent the school district's failures."  Id. at 527; see also Brown, 2016 WL 1452330, at *11 (defining compensatory education to "put [the student] in a situation that he would have otherwise been in had [DCPS] originally carried out its obligations").  The Court may also order the school district to pay for educational evaluations and vocational assessments to assist the parties in crafting an appropriate compensatory plan.  See Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt, 583 F. Supp. 2d 169, 172 (D.D.C. 2008).  Private-school placement "aimed at ensuring that the child receives tomorrow the education required by IDEA" is also permissible relief, provided such an award is "tailored to meet the child's specific needs."  Branham, 427 F.3d at 11–12 (emphasis omitted).

For their part, Plaintiffs requested several remedies at the outset of this action, including a declaration that DCPS denied R.H. a FAPE, an order that DCPS provide R.H. with a private placement at New Beginnings Vocational School, an order to conduct additional IEEs and discuss their results during a subsequent IEP meeting, and an appropriate determination of compensatory education.  AR 202–03.  In light of the Court's findings, it will order DCPS (1) to conduct (a) a speech-language evaluation, (b) a vocational level II assessment, and (c) to fund an independent FBA for R.H.; (2) to develop a new IEP for him based on the findings of these

evaluations; (3) to fund R.H.'s placement into New Beginnings for the 2016–2017 school year;

(4) to fund transportation services to get him to and from New Beginnings; (5) to fund or provide

him with 178.1 hours of compensatory education; and (6) to fund or provide him with 50 hours

of counseling.  The Court's reasoning for this remedy is detailed below.

### 1. New Evaluations and IEP

Because Plaintiffs established that DCPS failed to provide R.H. with speech language and

vocational level II evaluations, and performed an inadequate FBA, the Court will order DCPS to

perform the first two evaluations and fund an independent FBA.  See 34 C.F.R. § 300.502(b)

(requiring DCPS to fund an independent educational evaluation "if the parent disagrees with an

evaluation obtained by the public agency").  Further, counsel for DCPS Hrg. Tr. 7, The Court

will also order that R.H.'s IEP Team meet to review and incorporate the results of the

evaluations into a new IEP within twenty days of DCPS's receipt of the last evaluation.[26]

### 2. Placement at New Beginnings Vocational School

This Court will not restrict R.H.'s relief to new evaluations and an IEP, however.

Plaintiffs have demonstrated both that DCPS denied R.H. a FAPE for much of the 2012–2013

and 2013–2014 school years, and that his present academic program is failing to meet his needs

given his disability.  Accordingly, the Court will also award him prospective relief in terms of a

new placement and compensatory education to remediate for DCPS' past IDEA violations.  See

Boose v. Dist. of Columbia, 786 F.3d 1054, 1056 (D.C. Cir. 2015) ("[A]n IEP carries no

---

[26] At the hearing, both sides agreed that it is time to perform another comprehensive psychological evaluation for R.H. since the last was performed in March 2013 and re-evaluation is required every three years.  See Hrg. Tr. at 7–8 (Plaintiffs' counsel indicating that another comprehensive psychological evaluation is due); id. at 32–33 (Defendant's counsel agreeing that "it would be time" for another comprehensive psychological evaluation); 20 U.S.C. § 1414(a)(2)(B)(ii) (mandating that re-evaluations occur at least once every three years unless the parents and school district agree otherwise).  Plaintiffs do not ask the Court to order such an evaluation in their Complaint, so the Court will not do so here.  However, the Court expects that a comprehensive psychological evaluation will occur alongside the other evaluations it has ordered because the time for re-evaluation is ripe and Plaintiffs have requested that another comprehensive psychological evaluation be performed.

guarantee of undoing damage done by prior violations, and that plan alone cannot take the place

of adequate compensatory education."); Reid, 401 F.3d at 522–23 (holding that courts may

award compensatory education when an IEP is found to be deficient); Branham, 427 F.3d at 11–

12 (distinguishing between prospective and retrospective relief).  Indeed, once it is established

that a compensatory education award is appropriate, "[c]hoosing instead to award plaintiff

nothing does not represent the 'qualitative focus' on [the student's] 'individual needs' that Reid

requires."  Stanton ex rel. K.T. v. Dist. of Columbia, 680 F. Supp. 2d 201, 207 (D.D.C. 2010)

(emphasis in original) (quoting Reid, 401 F.3d at 524).

In arriving at its remedy, the Court has given careful consideration of R.H.'s specific

learning disability and his academic progress – or lack thereof – during the 2012–2013 and

2013–2014 school years.  What is clear from the record is that R.H.'s current educational

program is failing him miserably.  As of the filing of the due process complaint, R.H. had

repeated the ninth grade three times.  The results of his three most recent academic evaluations

available in the record explain why.  AR 42–45, 153–55, 169–71.  According to his December

18, 2012, WJ-III ACH, R.H. possessed "low" mathematics and reading capabilities, correlating

to a GE of 4.7 and 5.2, respectively.  Id. at 42–43.  He also possessed a "very low" written

expression ability, which amounted to a GE of 3.4.  Id. at 45.  Comparing these results to those

of his more recent WJ-III ACH, it appears that R.H.'s abilities have remained stagnant despite

his education program outlined in the January 2013 IEP.  Compare id. at 42–43 (WJ-III ACH

from December 18, 2012, showing a mathematics GE of 4.7 and a reading GE of 5.2), with id. at

169–70 (WJ-III ACH from December 18, 2013, showing a mathematics GE of 4.7 and a reading

GE of 5.2).  Even more troubling, a comparison between the earlier evaluation and his November

2013 WIAT–III indicates that R.H.'s reading and written expression abilities actually regressed

between December 2012 and November 2013.  Compare id. at 43–45 (WJ-III ACH from

December 18, 2012, showing a reading GE of 5.2 and a written expression GE of 3.4), with id. at

154 (WIAT–III from November 6, 2013, showing an average reading GE of 2.6 and an average

written expression average GE of 2.8).  Based on these GEs, it is evident that R.H is many

academic years behind his grade level.  Indeed, according to Plaintiffs' expert, R.H. is six to nine

years behind his peers.  Id. at 605.

At this late point in his secondary education, it is evident that only a significant change in

R.H.'s educational program will stand a chance of enabling him to overcome his specific

learning disability, achieve passing marks, and advance from grade to grade.  What is shocking is

that, despite his poor performance during the prior school year, the only change that his IEP

Team made to his December 2013 IEP was to cut off his access to transportation services that

were previously determined necessary for him to get to school.  The undersigned considers that

decision, as well as the deficiencies leading up to it detailed above, to be serious violations of the

IDEA, made all the more troubling because it was reached in the absence of R.H.'s mother.

Thus, the Court's remedy for R.H. is guided both by the serious nature of the IDEA violations at

issue and R.H.'s dire situation as a high schooler with less than three years of FAPE remaining to

correct the educational deficiencies that have cause him to fall six to nine years behind his grade

level.  See Brown, 2016 WL 1452330, at *10 ("[T]he [relatively serious] violation calls for a

more robust remedy in order to place the plaintiff in a similar position he would have been in had

the violation not occurred in the first place.").

Considering all of these factors, the Court finds that R.H. required, as of his December

2013 IEP, placement in a school that could provide him with full-time specialized instruction and

where he could learn a trade.  For this reason, the Court will order as a remedy DCPS to fund

tuition for R.H. to attend New Beginnings for the 2016–2017 school year.

      This conclusion is amply supported by the record.  See Q.C-C. v. Dist. of Columbia, No.

1:15-00400 (RC), 2016 WL 614367, at *13–14 (D.D.C. Feb. 16, 2016) (supporting the court's

placement decision with expert testimony and evaluative data).  The results from R.H.'s

evaluations, described above, demonstrate that, because of his specific learning disability and

deficiencies in his educational program, he required far more specialized education than his

December 2013 IEP provided.  AR 42–45, 153–55, 169–71.  Further, the independent

comprehensive psychological evaluation from December 18, 2013 explicitly recommended that

R.H. receive full-time specialized instruction in a trade school.  Id. at 161–62.  Plaintiffs' expert,

Ms. Millis, also corroborated that finding with her own assessment that R.H. should be placed in

an eleven-month instructional program with full-time special education services in a small-class

setting.  Id. at 607.  Finally, R.H. stated a strong preference to attend New Beginnings because,

in his words, it would teach him the vocational skills he "need[s] to survive."  Id. at 544; see also

Brown, 2016 WL 1452330, at *10 ("[A]s the IDEA envisions a collaborative process, . . . it is

only logical the student's previously-stated preferences play some role in determining the

specifics of a compensatory education.").

      Moreover, the Court finds that New Beginnings is the only educational facility identified

in the record that can meet R.H.'s demonstrated needs.  See Q.C-C., 2016 WL 614367, at *13

(ordering DCPS to fund the student's placement at "the only potential placement in the record

that could satisfy [her] needs").  According to the testimony of Ms. Smith, the Director of New

Beginnings, the school contains a full-time vocational program with small class sizes and an

eleven-month instructional curriculum, that primarily serves students with disabilities.  AR 641–

43. New Beginnings also maintains the same academic requirements as DCPS. Id. Moreover, it offers speech and counseling services. Id. Thus, as Plaintiffs' expert fairly concluded, New Beginnings "ha[s] the small, well-structured environment to help [R.H.] with [his] academics . . . [and] vocational needs." Id. at 647.[27]

By contrast, Eastern has not met R.H.'s academic needs to date, nor is there any evidence in the record demonstrating that it could. It plainly wasn not meeting his academic needs as of December 2013. Further, Mr. Cox's testified that Eastern does not provide vocational programs during the school day. Id. at 710. And the extracurricular vocational activities it does provide have minimum GPA requirements that R.H. has not satisfied. Id. Further, during the hearing, counsel for DCPS was not able to identify a public vocational school in D.C. on par with New Beginnings. Hrg. Tr. at 31. Thus, the Plaintiffs have meet their burden of proving by a preponderance of the evidence that New Beginnings is the only potential placement identified in the record that would be appropriate given R.H.'s needs. See Q.C-C., 2016 WL 614367, at *13 (placing student into specific private placement based on the preponderance of the evidence and "given that [the private school] is the only potential placement in the record that could satisfy [the student's] needs").

Accordingly, the Court will order DCPS to fund tuition for R.H. to attend New Beginnings during the 2016–2017 school year. Further, given R.H.'s demonstrated need for transportation services, if New Beginnings does not provide transportation for its students as part of its tuition, DCPS shall fund his transportation to and from the school every day of the week that school is in session.

---

[27] Counsel for Plaintiffs has also confirmed that New Beginnings has a space available for R.H. for the 2016-2017 school year. Pls' Notice [Dkt. 25] at 1.

3.      Compensatory Education

In calculating a compensatory award, the Court must conduct a "fact-specific inquiry" to decide what award is "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." Reid, 401 F.3d at 524.  Here, Plaintiffs have demonstrated that R.H. was denied a FAPE for the second half of the 2012–2013 school year and the entirety of the 2013–2014 school year. During each period R.H. received fewer hours of specialized education than he was entitled to under the operative IEP.  Specifically, DCPS provided R.H. none of the ten hours per week of specialized instruction he was prescribed under the January 2013 IEP during the second half of the 2012–2013 school year, i.e., from Friday, January 11, 2013, through June 20, 2013.  See DCPS Calendar:  School Year 2012–13, at 4–12.  Thus, during this 22-week period, R.H. was denied a total of 220 hours of specialized instruction.

Similarly, as discussed previously, DCPS only provided R.H. an average of 3.3 hours of the ten hours of specialized instruction per week he was prescribed during the first half of the 2013–2014 school year, i.e., from Monday, August 26, 2013, through the December 2013 IEP meeting.  See DCPS Calendar:  School Year 2013–14, at 2–6.  For this 17-week period, R.H. was therefore denied a total of approximately 113.9 hours of specialized instruction.

For the remaining twenty-three weeks of the school year from Thursday, December 19, 2013, through Thursday, June 19, 2014, the Court finds that the ten hours per week prescribed in the December 2013 IEP are an inappropriate measure of the number of hours of specialized education R.H. should have received.  Instead, the Court uses as a yardstick 27.5 hours of specialized instruction per week – an amount that equates to the full-time specialized instruction that the Court has found DCPS should have provided R.H. in his December 2013 IEP.  Using

that as a measure, and subtracting the average of 3.3. hours per week of specialized instruction

that R.H. was provided, the Court finds that he was denied 556.6 hours of specialized instruction

for the final twenty-three weeks of the 2013–2014 school year.  Combining the totals for both

school years, the Court finds that R.H. was denied a total of approximately 890.5 hours of

specialized instruction during the relevant time period raised in Plaintiffs' federal complaint.

   As other judges of this District have done, this Court will apply a ratio to the total hours

of missed specialized instruction to determine an award of compensatory tutoring.  See Kelsey v.

Dist. of Columbia, 85 F. Supp. 3d 327, 331 (D.D.C. 2015) (1.5 hours of compensatory education

for every 1 hour that the student lost); see also Friendship Edison Pub. Charter Sch. Collegiate

Campus v. Nesbitt, 532 F. Supp. 2d 121, 123 (D.D.C. 2008).  The Court will apply a one-to-five

ratio because the Court believes that an hour of one-on-one tutoring fairly approximates five

hours of the type of specialized education that R.H. was denied.  In his January 2013 and

December 2013 IEPs, R.H's specialized instruction was to occur "outside the general education

setting," or, in other words, in a small-class setting with few other students and a greater

emphasis on individualized attention from the teacher.  AR 47, 173.  Specifically, Mr. Cox

testified that, as part of R.H.'s specialized instruction, he participated in a reading class of five

students led by Mr. Cox.  Id. at 659.  Because R.H. received his prescribed specialized

instruction in a small class of five students, awarding him one hour of one-on-one tutoring for

every five hours of the five-student specialized education class he was denied would "elevate

[R.H.] [] to the position he would have occupied absent the school district's failures."  Reid, 401

F.3d at 527; see also Gill v. Dist. of Columbia, 770 F. Supp. 2d 112, 118 (D.D.C. 2011)

(rejecting expert's claim that 150 hours of compensatory education was appropriate when there

was no rational reason for that amount as opposed to any other). Applying this ratio to the 890.5

hours of specialized education that R.H. was denied results in a figure of 178.1 hours of compensatory tutoring.

 As a point of comparison, Plaintiffs' expert recommended a very similar number of hours of compensatory tutoring based on what R.H. was denied as measured by his IEPs:  200 hours. Id. at 610–11.  Acknowledging the imprecision inherent in endeavoring to calculate the value of the education R.H. has been denied, this Court is satisfied that its analysis fairly approximates the education he lost and meets the "fact-specific" inquiry required by Reid to tailor R.H.'s award to his specific needs.  See Reid, 401 F.3d at 524; see Mary McLeod Bethune Day Academy Pub. Charter Sch. v. Bland, 555 F. Supp. 2d 130, 133–34 (D.D.C. 2008) (upholding a compensatory education award when the hearing officer first found the difference between the student's prescribed hours of specialized instruction and the hours that he received, then comparing that total to the expert's recommended award, since the hearing officer "conducted a fact-specific inquiry and tailored the award to [the student's] individual needs by taking into account the results of [an evaluation] and the recommendations of [an expert]").

 Finally, the Court is cognizant of R.H.'s need for counseling services – a need that existed at least as early as March 4, 2013.  See AR 70, 74 (DCPS psychological evaluation recommending counseling for R.H. to "address motivation, frustration, and provide coping strategies for stressful events in his life").  Because of this demonstrated need and the already-significant delay in acquiring these services, the Court will grant R.H. 50 hours of counseling services.  See Petit v. U.S. Dep't of Educ., 675 F.3d 769, 773 (D.C. Cir. 2012) (observing that the IDEA requires an IEP to provide education and "related services," including counseling, to a student based on his or her needs) (citing 20 U.S.C. § 1414(d)(1)(A)(i)(IV)); see also 20 U.S.C. § 1401(26)(A) (defining "related services" to include, among other things, "counseling services").

These 50 hours are awarded separately from the 178.1 hours of tutoring in R.H.'s areas of academic concern.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment [Dkt. 12] will be **GRANTED IN PART** and DCPS' Motion for Summary Judgment [Dkt. 13] will be **DENIED**. An Order consistent with this Memorandum Opinion will be filed contemporaneously herewith.

Date:  August 26, 2016

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE